*Bellamy v. City of New York*

# In the

# United States Court of Appeals

## For the Second Circuit

_____

AUGUST TERM, 2017

ARGUED: APRIL 26, 2018
DECIDED: JANUARY 29, 2019

No. 17-1859-cv

KAREEM BELLAMY,
*Plaintiff-Appellant,*

*v.*

CITY OF NEW YORK, JOHN J. GILLEN, AND MICHAEL F. SOLOMENO,
*Defendants-Appellees,*

John Doe 1, John Doe 2, Supervising Officers at the NYPD 101st
Precinct, Vincent NMI Pepe, and Robert Schruhl,
*Defendants.*

_____

Appeal from the United States District Court
for the Eastern District of New York.
No. 12-cv-01025 – Ann M. Donnelly, *Judge.*

_____

Before: WALKER AND JACOBS, *Circuit Judges*, SHEA, *District Judge*.[*]

_____

---

[*] Judge Michael P. Shea, of the United States District Court for the District of Connecticut, sitting by designation.

Kareem Bellamy filed this action in the Eastern District of New York under New York state law and 42 U.S.C. § 1983 following the vacatur of his state convictions for murder in the second degree under N.Y. Penal Law § 125.25(2) and criminal possession of a weapon in the fourth degree under N.Y. Penal Law § 265.01(2), for which he served more than 14 years of a 25 years-to-life sentence. Bellamy sued investigating Detectives Michael Solomeno and John Gillen of the New York Police Department (and certain John Does) as well as the City of New York (at times, the "City"), alleging that each are responsible for constitutional infirmities that infected Bellamy's criminal trial, caused his wrongful conviction, and resulted in damages. The district court granted the Defendants' motion for summary judgment.

As relevant on appeal, Bellamy alleged that Detectives Solomeno and Gillen fabricated inculpatory evidence and failed to disclose material exculpatory or impeaching evidence depriving Bellamy of his rights to due process and a fair trial. Bellamy alleged that the City is responsible, pursuant to *Monell v. Department of Social Services of City of New York*, 436 U.S. 658 (1978), for violations of Bellamy's due process rights caused by certain policies of the office of the Queens County District Attorney ("QCDA"), the office that prosecuted Bellamy. Principally, Bellamy alleged that (i) the QCDA's office failed to disclose to the defense substantial benefits received by

a key state witness due to an office policy of purposefully shielding from prosecutors (and thereby the defense) the full scope of relocation benefits given to witnesses in its witness protection program; and (ii) his prosecutor made prejudicial improper remarks during his summation, which was ultimately a result of the QCDA's office's customary indifference to its prosecutors' summation misconduct.

The district court (Donnelly, *J.*) granted Defendants' motion for summary judgment and dismissed each of Bellamy's claims. As relevant here, the district court rejected the claims against Detectives Solomeno and Gillen on the ground that Bellamy raised no material issue of fact as to whether either detective fabricated or withheld material evidence. The district court rejected the claims against the City, concluding that the City could not as a matter of law be liable under *Monell* for the alleged policies of the QCDA's office, and that, in any event, Bellamy did not raise a material issue of fact as to either of the constitutional violations underlying his *Monell* claims.

The questions for our determination are whether Bellamy has produced sufficient evidence to raise material issues of fact that must be tried to a jury and whether the district court erred in dismissing the *Monell* claims as a matter of law. If not, summary judgment was proper; if so, then summary judgment should not have been granted.

We conclude that Bellamy has raised material issues of fact as to certain, but not all, of his claims that Detectives Solomeno and Gillen fabricated and withheld material evidence, and we therefore VACATE in part and AFFIRM in part the dismissal of Bellamy's claims against them.  We further conclude that the City of New York may be held liable for the consequences of the alleged policies of the QCDA's office under the *Monell* doctrine, and that Bellamy has raised material issues of fact as to the underlying constitutional violations: the non-disclosure of financial benefits received by one of the state's principal witnesses and the impropriety of his prosecutor's summation.  Consequently, we VACATE the dismissal of Bellamy's claims against the City.

We REMAND the cause for further proceedings consistent with this opinion.

Judge Jacobs dissents in a separate opinion.

————

JOEL B. RUDIN, Law Office of Joel B. Rudin, P.C., New York, NY, *for Plaintiff-Appellant*.

MEGAN E.K. MONTCALM (Richard Dearing, *on the brief*), for Zachary W. Carter, Corporation Counsel of the City of New York, New York, NY, *for Defendants-Appellees.*

Richard D. Willstatter, Vice Chair, Amicus Curiae Committee of the National Association of Criminal

Defense Lawyers, Chair, Amicus Curiae Committee of the New York State Association of Criminal Defense Lawyers, White Plains, NY; Adele Bernhard, Innocence Network, New York, NY; Barry Scheck, Innocence Project, New York, NY; Ross E. Firsenbaum, Wilmer Cutler Pickering Hale and Door LLP, New York NY, *for Amici Curiae National Association of Criminal Defense Lawyers, New York State Association of Criminal Defense Lawyers, Innocence Network, and Innocence Project*.

————

JOHN M. WALKER, JR., *Circuit Judge*:

Kareem Bellamy filed this action in the Eastern District of New York under New York state law and 42 U.S.C. § 1983 following the vacatur of his state convictions for murder in the second degree under N.Y. Penal Law § 125.25(2) and criminal possession of a weapon in the fourth degree under N.Y. Penal Law § 265.01(2), for which he served more than 14 years of a 25 years-to-life sentence. Bellamy sued investigating Detectives Michael Solomeno and John Gillen of the New York Police Department (and certain John Does) as well as the City of New York (at times, the "City"), alleging that each are responsible for constitutional infirmities that infected Bellamy's criminal trial, caused his wrongful conviction, and resulted in damages. The district court granted the Defendants' motion for summary judgment.

As relevant on appeal, Bellamy alleged that Detectives Solomeno and Gillen fabricated inculpatory evidence and failed to disclose material exculpatory or impeaching evidence depriving Bellamy of his rights to due process and a fair trial. Bellamy alleged that the City is responsible, pursuant to *Monell v. Department of Social Services of City of New York*, 436 U.S. 658 (1978), for violations of Bellamy's due process rights caused by certain policies of the office of the Queens County District Attorney ("QCDA"), the office that prosecuted Bellamy. Principally, Bellamy alleged that (i) the QCDA's office failed to disclose to the defense substantial benefits received by a key state witness due to an office policy of purposefully shielding from prosecutors (and thereby the defense) the full scope of relocation benefits given to witnesses in its witness protection program; and (ii) his prosecutor made prejudicial improper remarks during his summation, which was ultimately a result of the QCDA's office's customary indifference to its prosecutors' summation misconduct.

The district court (Donnelly, *J.*) granted Defendants-Appellees' motion for summary judgment and dismissed each of Bellamy's claims. As relevant here, the district court rejected the claims against Detectives Solomeno and Gillen on the ground that Bellamy raised no material issue of fact as to whether either detective fabricated or withheld material evidence. The district court rejected the claims against the City, concluding that the City could not as a matter of law

be liable under *Monell* for the alleged policies of the QCDA's office, and that, in any event, Bellamy did not raise a material issue of fact as to either of the constitutional violations underlying his *Monell* claims.

The questions for our determination are whether Bellamy has produced sufficient evidence to raise material issues of fact that must be tried to a jury and whether the district court erred in dismissing the *Monell* claims as a matter of law.  If not, summary judgment was proper; if so, then summary judgment should not have been granted.

We conclude that Bellamy has raised material issues of fact as to certain, but not all, of his claims that Detectives Solomeno and Gillen fabricated and withheld material evidence, and we therefore VACATE in part and AFFIRM in part the dismissal of Bellamy's claims against them.  We further conclude that the City of New York may be held liable for the consequences of the alleged policies of the QCDA's office under the *Monell* doctrine, and that Bellamy has raised material issues of fact as to the underlying constitutional violations: the non-disclosure of financial benefits received by one of the state's principal witnesses and the impropriety of his prosecutor's summation.  Consequently, we VACATE the dismissal of Bellamy's claims against the City.

We REMAND the cause for further proceedings consistent with this opinion.

**BACKGROUND**

This appeal requires us to address the complex and protracted facts surrounding the events pertaining to the 1994 killing of James Abbott.  While Plaintiff-Appellant Kareem Bellamy was ultimately convicted in New York state court for Abbott's murder, the uncertain circumstances of the killing, and the investigation and trial that followed, sparked a lengthy, circuitous, and at times dramatic legal fight that continued into post-conviction proceedings.  That battle began with what the record shows to have been a hard-fought criminal trial with no certain outcome in sight.  Ultimately, Bellamy was acquitted on the charge of intentional murder but convicted of depraved indifference murder and unlawful possession of a weapon. After Bellamy exhausted his direct appeal opportunities without success, the post-conviction litigation proceeded in two general stages. First, after a prolonged and complicated state post-conviction process, the state court vacated Bellamy's convictions in light of newly discovered evidence that another individual might have committed the Abbott murder.  Second, following the state's decision not to re-try him and his release from prison, Bellamy sought civil relief in federal court alleging that his criminal trial was infected with constitutional error.  The instant lawsuit concerns only the latter fight, which pertains not to how or why Bellamy was released but whether constitutional error led to his conviction in the first place.

In assessing the constitutional propriety of Bellamy's criminal trial, we are aided by (i) an extensive summary judgment record, which includes documents related to the investigation and prosecution of Bellamy; (ii) the record of Bellamy's criminal trial; (iii) the record of Bellamy's state post-conviction proceedings; and (iv) extensive deposition testimony taken in this action.[1] Although much is in contention in this case, what follows are the undisputed facts from this complicated record and other relevant facts that we identify as remaining in dispute.

**I.     James Abbott's Murder and the Resulting Investigation**

Shortly before 10:00 a.m., on Saturday, April 9, 1994, an assailant fatally stabbed James Abbott near a phone booth during an altercation after Abbott left a C-Town Supermarket in Far Rockaway, Queens. Detectives Michael Solomeno and John Gillen of the NYPD's 101st Precinct were assigned to investigate. In canvassing the area, Detective Gillen, with other officers, entered the C-Town store with a photo of Abbott to see if anyone had witnessed anything. Detective

---

[1] Throughout this opinion, we cite to the transcripts of Bellamy's criminal trial ("Trial Tr."), the first and second hearings held on Bellamy's New York state post-conviction motion filed pursuant to N.Y. Crim. Proc. Law § 440.10 ("First 440 Tr." and "Second 440 Tr.," respectively), and deposition testimony taken in this case ("[] Dep. Tr."). We direct the reader to the district court docket to review the full versions of these transcripts. *See* No. 12-cv-1025 (E.D.N.Y.), Dkt. Nos. 188–99, 204–13 [hereinafter, "Dkt. No. []"].

Gillen spoke with Jay Judel, a C-Town deli clerk, who reported that Abbott, a regular customer, had been in the store alone that morning. Another officer interviewed Andrew Carter, a wheelchair-bound man living adjacent to the C-Town who said that he saw the attack while waiting at a bus stop down the street from the phone booth where the altercation took place. Carter told the officer that he saw three males he did not recognize leave the C-Town, and that when one stopped to use the payphone, the other two "started punching and kicking" him, and that "one of the males then produced a knife and started stabbing the victim numerous times about the body and head." App'x 234. Carter told the officer that the two men fled on foot.

The following week, on April 15, 1994, Detective Gillen received a phone call from a woman who identified herself as Anna Simmons. Simmons reported that she had overheard two individuals, Levon ("Ish") Martin and Rodney ("Turk") Harris, discussing the Abbott murder. Simmons said that she heard Ish and Turk bragging that they had killed Abbott following Abbott's refusal to join their gang, the Regulators. The following day, Detectives Solomeno and Gillen re-interviewed Carter, who was unable to identify Ish and Turk from a photo array. In the days that followed, Detectives Solomeno and Gillen tried to track down Simmons, but never found her.

On April 22, 1994, Linda Sanchez, a C-Town cashier who was working at the store on the morning of Abbott's murder, called the 101st Precinct.[2] Detectives Solomeno and Gillen then interviewed her at her home. Sanchez told the detectives that on the morning of the murder, Abbott, whom she recognized, entered the store, collected certain goods and got in a cashier's line, and that two other men then came into the store and ultimately got in line behind Abbott. After making his purchases, Abbott remained in the store to speak with the store's manager, "JJ," while the two men behind Abbott in line had left the store and started walking through the parking lot "toward the chicken store." App'x 237. Sanchez noted that before they left the parking lot, the two men stopped and looked back at the C-Town store. Sanchez herself then walked to the parking lot to collect shopping carts whereupon she saw Abbott walk out of the store through the parking lot and also in the direction of the "[c]hicken store." App'x 237–238. The detectives showed Sanchez a photo array that included Ish and Turk—the two men identified in the Anna

[2] Sanchez's telling of why she called the police on April 22, 1994 has not been entirely clear. On direct examination she testified (and Defendants agree) that she called the police because Bellamy threatened her. Trial Tr. 706–08. Sanchez, however, did not then mention those threats in her phone call to the precinct or in the interview that followed, and on cross-examination, she at times suggested that her call was prompted by an article about the Abbott murder in The Wave newspaper, which listed Detective Solomeno's contact information. *See* Trial Tr. 741–51.

Simmons phone call—but she did not recognize them as the two men she had seen in the store in line behind Abbott.

Three weeks later, on May 13, 1994, Sanchez again called the precinct to report that a man, who was drinking a 40-ounce beer across the street from the C-Town, was one of the two men that she had previously reported were in the cashier's line behind Abbott on the morning of Abbott's murder. Shortly thereafter, Detective Gillen arrived on the scene with other detectives, and they saw Bellamy drinking a 40-ounce beer in the location Sanchez described. The detectives detained Bellamy in a squad car and told him that he was being taken to the station to be fined in relation to his public drinking. As we will discuss later, Detective Gillen said at trial that Bellamy made spontaneous and unprompted comments in the police car regarding a murder, but Bellamy denies that this occurred.

At the police station, Detective Gillen showed Bellamy a photo of Abbott's body and told him that there were witnesses identifying him as the assailant. Bellamy denied any involvement in the murder and told Detective Gillen that he was with a friend named Terrill Lee on the day of the murder. Bellamy was placed in a holding cell overnight.

The following day, May 14, 1994, Detective Gillen orchestrated a six-person lineup at the precinct, to be viewed by Sanchez and Carter, the sole eyewitnesses known to the detectives at that time.

Bellamy was in position one. Sanchez identified the individual in position one as one of the two men she saw leave the C-Town prior to Abbott on the day of Abbott's killing. As to be discussed, the parties dispute certain aspects of what occurred during Carter's viewing of the lineup. All agree, however, that Carter initially recognized one of Abbott's assailants in either position one or two but that he subsequently told Detective Gillen in a separate room that he was "99% sure" that the person he recognized was in position one, which in fact was Bellamy. App'x 295, 2415.

Hours later, in the early morning of May 15, 1994, Detective Gillen and Assistant District Attorney (ADA) Stephen Antignani of the QCDA's office took a sworn statement from Terrill Lee, the man Bellamy claimed he was with on the day of Abbott's murder. Lee stated that although he was friends with Bellamy, he was not with him at all on April 9, 1994. Thereupon, that same day, Detective Gillen filled out a criminal complaint charging Bellamy with Abbott's murder.

## II.    Criminal Proceedings Against Kareem Bellamy

The grand jury indicted Bellamy on two counts of murder in the second degree under N.Y. Penal Law § 125.25(1) (intentional murder) and § 125.25(2) (depraved indifference murder), and one count of criminal possession of a weapon in the fourth degree under N.Y. Penal Law § 265.01(2). After unsuccessful suppression motions

by the defense, the case proceeded to trial in November 1995 with ADA David Guy of the QCDA's office as the prosecutor.

As relevant to this appeal, the state called the following witnesses: (i) Detective Gillen; (ii) Linda Sanchez; (iii) Detective Solomeno; (iv) Carter; (v) Deborah Abbot, the victim's sister; and (vi) Veronica Walker, an eyewitness who surfaced for the first time during the trial. We summarize the relevant portions of each state witness's trial testimony and the summations.[3]

*Detective Gillen.* Detective Gillen's testimony described his investigation of the Abbott murder. He testified about his initial discussion with Carter on the day of the murder, the Anna Simmons phone call the following week, and his role in the lineups. Detective Gillen also testified about the circumstances of picking up Bellamy following Sanchez's call to the precinct. Detective Gillen testified with reference to an unsigned handwritten note that he wrote, that he said was his contemporaneous memorialization of Bellamy's utterance in the squad car on the way to the police station: "This must be a case of mistaken identity—someone probably accused me of murdering someone." Trial Tr. 494–95; *see* App'x 290. Detective

---

[3] Bellamy's lone witness was Bellamy's stepfather, with whom Bellamy lived on the day of the murder. Bellamy's stepfather testified that Bellamy did not leave the house on the day of the murder until 10:15–10:20 a.m. Trial Tr. 1027–29.

Gillen then testified that after arriving at the station he added the following notation on the same piece of paper: "Statement made by [Bellamy] while being asked his pedigree—spontaneous & unsolicited." Trial Tr. 534–40; App'x 1707.[4] On cross-examination, Detective Gillen acknowledged that he did not incorporate any of Bellamy's statements in a "DD-5," known as a "complaint follow up" form, despite having prepared eight DD-5s throughout the investigation of the Abbott murder. Trial Tr. 527–28, 532–34.

*Linda Sanchez*.[5] ADA Guy began his questioning of Sanchez by soliciting her biographical information and then asking if she "receive[d] any money from the office of the [QCDA] prior to coming into court today?" Trial Tr. 633. Sanchez acknowledged that she had received $50 from the QCDA's office and anticipated receiving another $50 from the office. She testified that the money was for "food for the babies, Pampers," and amounted to "$25 a day." Trial Tr. 634.

---

[4] Detective Gillen did not testify at trial as to another purported statement from Bellamy that he recorded on the same piece of paper: "Why would someone accuse me of something I didn't do?" App'x 1707. Nevertheless, the document in its entirety was entered into evidence at trial. *See* Trial Tr. 538. Detective Gillen acknowledged in a pre-trial hearing that he recorded the first "murder" statement right away in the squad car and wrote the second "accuse" statement on the same piece of paper when he returned to the precinct. App'x 2413.

[5] It appears that the prosecution viewed Sanchez as a reluctant witness, in that she showed up to testify only after the prosecution served her with a material witness order on the first day of trial. App'x 2044. ADA Guy did not refer to Sanchez in his opening statement.

She further testified that she "came [to court] with the detective," and that she was staying overnight at a "different location" than her residence, and that "[t]he detective" "put [her] into that differen[t] location." Trial Tr. 634–35.

Sanchez then testified as to what she saw on the morning of April 9, 1994. She identified Bellamy as being in the C-Town that morning, wearing a green jacket and braids in his hair, with "a lot of braids sticking up," and that he and another taller person went to the same line as Abbott. Trial Tr. 639–41, 774. Sanchez had seen Bellamy in the C-Town many times before and noticed him that day because "[h]e was buying beer on a Sunday—on a Saturday that day." Trial Tr. 642. Bellamy was in the store for about fifteen minutes and walked out before Abbott. Sanchez noticed Bellamy turn to the right after he left the store, rather than to the left, the direction in which he usually departed from the store. Sanchez then walked to the parking lot to retrieve shopping carts when she noticed Abbott catch up to Bellamy and the taller person and pass by them. Sanchez testified that when NYPD officers came to the C-Town later that morning, she did not speak to them.

Finally, Sanchez testified that Bellamy threatened her on two separate occasions after the Abbott murder. A week after the murder, Bellamy entered the C-Town and said to her: "You know, you know, you fucking bitch. . . . You're next." Trial Tr. 706. Then, Sanchez

testified that the following occurred on the street on May 13, 1994 before she called the police: "He was pointing at me. You know yelling, at like, yelling something at me. Just pointing and pointing at my direction." Trial Tr. 710. Sanchez testified that she never told the police about these threats, and that she had not told anyone about them until one week before Bellamy's trial (in November 1995).[6]

*Detective Solomeno.* Detective Solomeno testified that he was initially the assigned detective on the investigation of the Abbott murder, and that he played a role in the Ish and Turk photo arrays shown to Sanchez and Carter and that he conducted the April 22, 1994 interview of Sanchez. Detective Solomeno also testified that, in the days prior to his trial testimony, he had spoken to Deborah Abbott, the victim's sister, who had given him the contact information for a woman named Veronica Walker. Detective Solomeno testified that he spoke with Walker shortly before trial on December 1, 1995 and that he prepared a DD-5 in connection with that interview.

*Andrew Carter.* Carter testified as to what he saw on the morning of the murder and what happened at the Bellamy lineup. On April 9, 1994, as he was waiting for the bus, he saw three people walk out of the C-Town store, one by himself and the other two together.

---

[6] However, Sanchez later testified that she mentioned the threats to an ADA immediately prior to testifying in front of the grand jury. Trial Tr. 758–59.

The three men came "right past" him, and then Carter looked in another direction. Trial Tr. 868. When Carter turned back towards the direction of the three men, "the other two guys were beating the hell out of [Abbott]." Trial Tr. 869. Carter then testified that one of the two men pulled out a "brass knuckle knife" and stabbed Abbott. Trial Tr. 872. Carter pointed to Bellamy from the witness stand and testified that the individual who stabbed Abbott was "the gentlemen right there." Trial Tr. 870–71. Carter had never seen any of the individuals before, but he got a good look at their faces. Trial Tr. 872–73. Carter had "[n]o doubt" that Bellamy was the person he saw stab Abbott that morning. Trial Tr. 872.

Carter then testified at length about viewing the lineup in which Bellamy was in position one. He testified that he initially told the detective that "it was either one or two, because they got their hair different." Trial Tr. 880. Specifically, Carter testified that the individual he saw stab Abbott did not have braids in his hair, but that the person in position one at the lineup did have braids. Carter then had a conversation in another room with an ADA and a detective where Carter "said [it was] two." Trial Tr. 883. Carter testified several times at trial that the individual he saw stab Abbott was in position number two in the lineup. Trial Tr. 895–96, 903–04. Nevertheless, Carter testified that he told the detectives at the time that it was "either one or two," but also that he was 99% sure the assailant was

in position number one.  Trial Tr.  882, 896, 903.  ADA Guy tried to sum up (but not resolve) the confusion on redirect, asking Carter: "You told us today it was number two, but you told the detective it was number one that day?"  Trial Tr. 904.  Carter responded, "Yes." Trial Tr. 904.

*Deborah Abbott*.  Deborah Abbott, the victim's sister, testified about a conversation she had with Veronica Walker in July of 1995, fifteen months after the killing of her brother but four months prior to the trial.  Following that conversation, she called the police and spoke with prosecutor ADA Guy.  The next time Deborah Abbott spoke to ADA Guy was one week before the trial, where she for the first time gave identifying information for Walker.

*Veronica Walker*.  Walker testified as to what she saw on the morning of April 9, 1994.  Walker stopped into the C-Town prior to a 10:00 a.m. hair appointment, and briefly spoke with Abbott who she recognized from her neighborhood.  She left the store after about 5–6 minutes, got in her car, and began to drive away.  She stopped at the adjacent intersection and saw through her car's passenger side window that Abbott was fighting with a lone man near a phone booth directly to her right.  Walker then made a righthand turn when a skinny 5'6" man with braided hair "came from across the left-hand side of the street from the back of [her] car, running across the street," and joined in the fight between Abbott and the unidentified man.

Trial Tr. 1001–03. Walker, who knew Bellamy personally, testified that she did not recognize the man who ran behind her car to join the fight, had never seen him before, and did not see him in the courtroom.

In an apparent attempt to impeach Walker's non-identification of Bellamy, ADA Guy then asked Walker about her interview with Detectives Solomeno and Gillen the previous week:

> Q:   Well, didn't you tell Detective Solomeno and Detective Gillen that you recognized that person [who you saw run by the car] as Kareem [Bellamy]?
>
> A:   No.
>
> Q:   What—Well, did you tell Detective Solomeno that the person looked like Kareem?
>
> A:   I said it could have been him. It could have.

Trial Tr. 1005. The defense asked Walker almost no questions.

*Defense Summation*.[7] In summation, the defense argued that the state had not shown that Bellamy committed the Abbott murder beyond a reasonable doubt. It argued that the case was a "rush to judgment," and that "the district attorney was anxious to close this case and so they closed it." Trial Tr. 1099. The defense principally attacked the three eyewitnesses. It argued that Sanchez's story lacked

---

[7] Under New York law, the defense delivers its summation first and has no right of rebuttal. *See* N.Y. Crim. Proc. Law § 260.30.

common sense and that she had a motive to lie given her receipt of $25 per day by the QCDA's office. The defense focused on Carter's trial testimony to the effect that the assailant was in position two at the lineup, not position one, and downplayed Carter's in-court identification by arguing that Carter simply pointed to the only "black man" at the defense counsel's table. Trial Tr. 1099. Counsel reminded the jury that Walker did not identify Bellamy as the person she saw run by her car, and rather acknowledged only that it *could* have been him. The defense also focused on the differing accounts from the witnesses as to whether the assailant did or did not have braided hair. Trial Tr. 1093; *compare* Trial Tr. 774 & 1003 (Sanchez and Walker's testimony that the assailant had braids) *with* Trial Tr. 896 (Carter's testimony that the assailant did not have braids).[8] The defense then argued that Bellamy never made the spontaneous "murder" statement in the squad car, and that even if he did, it was not inculpatory. Finally, the defense counsel reminded the jury that the state had never attempted to establish any motive for the killing.

*State's Summation*. ADA Guy delivered a lengthy summation, acknowledging, at the outset, that the evidence in the case was messy and was not presented in a "tidy little package" for the jury. Trial Tr.

---

[8] The trial testimony Carter gave as to Bellamy's hair contradicted his testimony at the grand jury, where he testified that on the day of the lineup the assailant "had his hair cut," but that on the day of the Abbott murder he had "[k]inky, short braids." App'x 334.

1113.  But, he argued, the jury's "task becomes relatively easy" when it applies common sense and focuses principally on the testimony of the three eyewitnesses.  Trial Tr. 1115.

ADA Guy acknowledged that Sanchez "may not be the most articulate person," and that she "got a little confused from time to time" and "didn't testify all that well," in that she made certain mistakes and contradictions, but that her story was credible, she had no reason to lie, and there was no "evidence that she is a liar."  Trial Tr. 1121, 1138–40, 1144.  ADA Guy also acknowledged certain contradictions in Carter's testimony and argued that Carter "made a mistake" when he said that the assailant was in position two at the lineup.  Trial Tr. 1134–36.  But, ADA Guy argued, "[y]ou don't have to take my word.  Common sense will tell you it's the defendant, number one, who is on trial, not some filler in a lineup."  Trial Tr. 1137.  ADA Guy also acknowledged Walker's non-identification of Bellamy in court but argued that the jury should instead focus on the physical description that she provided of the individual she saw on the morning of the Abbott murder, which is consistent both with Bellamy's actual description and the other eyewitnesses' description of the assailant.

ADA Guy then addressed the defense's remaining contentions. He answered the defense's contention that the state offered no motive for Bellamy's alleged killing of Abbott by arguing that there was no

proof, either way, of motive in this case, "submit[ting that] there is no proof that he had *no* motive." Trial Tr. 1133 (emphasis added). ADA Guy also reminded the jury of Detective Gillen's testimony regarding Bellamy's "premature denial" in the squad car, arguing that it was in character with Bellamy's inability to "keep his mouth shut," a mouth that ADA Guy argued was "huge" and "cavernous," as well as Bellamy's status as a "liar." Trial Tr. 1145–48.

ADA Guy concluded by again imploring the jurors to use their common sense. As reflected in the trial transcript, ADA Guy told the jury: "I know who committed the murder. You know it was an intentional murder and you know there is no rational explanation for why so many people are pointing their fingers at [Bellamy]." Trial Tr. 1149.[9] ADA Guy concluded in substance: "When the defendant asked why would someone be accusing me of murder, by your verdict you can answer his question. Because you are the murderer. It's because the evidence shows that you are the murderer, and that you are not going to get away with it, not this time." Trial Tr. 1150.

*       *       *

After three days of deliberations, during which the jury submitted eighteen notes to the judge, sought lengthy readbacks of

---

[9] As to be discussed, the Defendants contend that the trial transcript contains a transcription error, and that ADA Guy stated, "*You* know who committed the murder."

testimony, and was given an *Allen* charge,[10] the jury acquitted Bellamy of intentional murder but convicted him of depraved indifference murder and a weapons charge. The court sentenced Bellamy to 25-years-to-life. Bellamy appealed the convictions, arguing (i) insufficiency of the evidence; (ii) that Detective Gillen provided false testimony; and (iii) that Bellamy's statements to Gillen and the lineup identifications should have been suppressed. The state appellate court affirmed, 247 A.D.2d 399, and leave to appeal to the Court of Appeals was denied, 91 N.Y.2d 970. Bellamy's federal *habeas corpus* petition, which depended entirely on his assertion that Gillen falsely testified as to Bellamy's statements in the squad car following his pickup, was denied and not appealed.

**III.    Bellamy's State Post-Conviction Proceedings**

In 2007, more than a decade after his conviction, Bellamy moved to vacate the judgment against him pursuant to N.Y. Crim. Proc. Law § 440.10(f), (g) and (h). *See People v. Bellamy*, 2008 WL 3271995, at *2–3 (Sup. Ct. Queens Cnty. June 27, 2008). The central

---

[10] "The term '*Allen* charge' is a generic term used for a type of supplemental instruction that is given to a deadlocked jury, first approved by the Supreme Court in *Allen v. United States*, 164 U.S. 492 (1896). 'A traditional *Allen* charge reminds the jurors about the importance of obtaining a verdict and encourages jurors to listen 'to each other's arguments' while also emphasizing that 'the verdict must be the verdict of each individual juror, and not a mere acquiescence in the conclusion of his fellows.' *Id.* at 501." *Smalls v. Batista*, 191 F.3d 272, 275 n.1 (2d Cir. 1999).

basis for the sought-after relief was § 440.10(g), which under certain circumstances allows for the vacatur of a guilty verdict upon the discovery of new evidence. The principal new evidence relied on by Bellamy was that: (i) another individual, Ish, had confessed to the Abbott murder to a police informant named Michael Green, and that Green had Ish on tape discussing the crime; and (ii) Carter recanted his trial testimony that identified Bellamy as the assailant and was now asserting that he falsely inculpated Bellamy at trial under pressure by Detective Gillen.

The state post-conviction court conducted a lengthy hearing, which included taking the testimony of several of the trial witnesses, including Carter,[11] Walker, Sanchez, and Detectives Solomeno and Gillen, as well as the testimony of Green and ADA Antignani. As will be discussed, some of the testimony at this hearing added further color to the events surrounding Abbott's murder, while other testimony conflicted with that given at trial. Following the hearing, the court granted Bellamy's motion and vacated his conviction based solely on the newly discovered evidence proffered by Green that

---

[11] On June 11, 2008, following his testimony at the initial hearing on Bellamy's § 440 motion (but prior to the second such hearing), Carter passed away.

inculpated Ish in Abbott's murder.[12] *See id.* at *11–12 (finding Carter's recantation not credible).

After filing an appeal of that judgment, however, the state moved for reargument before the hearing court, arguing that the evidence from Green that the court relied on to vacate Bellamy's conviction was perjurious and fraudulent. The state submitted an affidavit from Green in which he now admitted that the tape he offered at the § 440 hearing purportedly capturing a conversation between Green and Ish was in fact a recording between Green and an acquaintance pretending to be Ish. *See People v. Bellamy*, 2010 WL 143462, at *1 (Sup. Ct. Queens Cnty. Jan. 14, 2010). The hearing court reopened the proceeding and again took significant witness testimony, including that of Green, who testified consistent with his affidavit that he created the false tape, that he lied at the earlier hearing, and that Ish never told him that he was involved in the Abbott murder.

Despite finding that Green had falsely testified about a fabricated tape, the court adhered to its earlier ruling ordering the vacatur of Bellamy's judgment of conviction. The court found parts of Green's testimony inculpating Ish at the initial hearing credible despite the fake tape and Green's subsequent recantation. *Bellamy*,

---

[12] The motion court referred to Green in this initial ruling on Bellamy's § 440 motion as "John Doe/CI." *See Bellamy*, 2008 WL 3271995, at *8–9.

2010 WL 143462, at *6. The Second Department affirmed, agreeing that a "reasonable jury could find . . . that [Green's] original unsolicited implication of [Ish] was truthful, regardless of [Green's] later recantation of those statements." 84 A.D.3d 1260, 1262 (2d Dep't 2011). Leave to appeal to the Court of Appeals was denied, 17 N.Y.3d 813, Bellamy was released from prison, and the state dismissed the indictment.[13]

**IV.    The Instant Civil Action**

In March 2012, Bellamy filed the instant action in the Eastern District of New York against the City of New York, Detectives Solomeno and Gillen, and two John Doe defendants.[14] At the core of

---

[13] In a series of rulings after Bellamy's conviction, the New York Court of Appeals significantly limited the reach of New York's criminal prohibition against depraved indifference murder, the only murder charge on which Bellamy was convicted. *See People v. Payne*, 3 N.Y.3d 266, 270 (N.Y. 2004). In short, the Court of Appeals concluded that where an act evinces an intent to kill, that act cannot support a depraved indifference charge, which is not a lesser included offense of intentional murder. *Id.* The state therefore conceded that it could not "in good faith, proceed with a subsequent prosecution [of Bellamy] for depraved indifference murder because we are legally prohibited from doing so. . . . [We] have no other choice but to move to dismiss this indictment against this defendant . . . not because he has been exonerated or because we believe him to be actually innocent but because a continued prosecution is not legally sustainable." App'x 698.

[14] On October 31, 2014, Bellamy filed an amended complaint replacing the two John Does with named defendants, Dkt. No. 82, but Bellamy withdrew that pleading and the parties stipulated that the original March 2012 complaint would be the operative complaint, Dkt. No. 110.

Bellamy's complaint were allegations that the Defendants engaged in material misconduct during the investigation and trial that deprived him of his rights to due process under the Fourteenth Amendment and to a fair trial under the Sixth Amendment. In short, Bellamy's claims at issue here fall into three general categories: (i) claims that Detectives Solomeno and Gillen fabricated material evidence; (ii) claims that Detectives Solomeno and Gillen withheld material evidence; and (iii) *Monell* claims against the City of New York based upon allegations that, pursuant to a policy, the QCDA withheld the full scope of relocation benefits it provided to Sanchez and that, due to a systemic failure to train or discipline, ADA Guy's summation was improper.[15] Specifically, as relevant on appeal, Bellamy's complaint alleges that:

---

[15] After the district court's denial of the Defendants' motion to dismiss, and Bellamy's withdrawal of his claims against the John Doe defendants, Dkt. 24, 110, one of his *Monell* claims, *see* Dkt. 112, 158 at 21 n.5, and a claim for negligent infliction of emotional distress, Dkt. 24, the following claims remained at issue:

(i)     Section 1983 claims against Detectives Solomeno and Gillen alleging a denial of due process, the right to a fair trial, and conscience shocking government action.

(ii)    Section 1983 and state law claims against Detectives Solomeno and Gillen alleging malicious prosecution.

(iii)   Section 1983 *Monell* claims against the City of New York.

(iv)    State law intentional infliction of emotional distress claims against Detectives Solomeno and Gillen.

(v)     A state law *respondeat superior* claim against the City of New York.

(i)     Detective Gillen fabricated evidence that Bellamy referenced a murder in the squad car that escorted him to the police station on May 13, 1994 and falsely testified as to such at Bellamy's criminal trial;

(ii)    Detective Solomeno fabricated evidence in the form of the contents of a DD-5 that reported that during her December 1, 2005 interview Walker identified Bellamy as the individual she saw on the morning of the Abbott murder;

(iii)   Detective Gillen improperly pressured Carter to identify Bellamy in the lineup conducted on May 14, 1994, even though Carter was unsure if Bellamy was the person he saw stab Abbott;

(iv)    Detective Gillen and/or Solomeno failed to disclose statements Sanchez made during the investigation indicating that the morning she saw Bellamy was a Sunday, rather than a Saturday, the day on which Abbott was killed;

(v)     Detective Gillen failed to disclose Sanchez's statement during the investigation that the person she saw with Bellamy on the morning of the Abbott murder was Terrill Lee;

(vi)    Detective Gillen failed to disclose Sanchez's statements to police officers on April 9, 1994, the day of Abbott's murder, that she "didn't see anything" and "didn't know anything";

(vii)   Detectives Solomeno and Gillen failed to disclose Walker's statements during her December 1, 2005 interview that Bellamy was *not* the person she saw on the morning of the Abbott murder and that Walker refused to sign the DD-5 to the effect that she had seen Bellamy;

(viii)  the prosecution failed to disclose to the defense the full relocation benefits received by Sanchez as part of her participation in the QCDA's witness protection program; and

(ix)    ADA Guy committed prejudicial summation misconduct.

The district court stayed discovery on the core of Bellamy's *Monell* claims (viii and ix above) but allowed discovery to proceed in full on the claims against Detectives Solomeno and Gillen. *See* Dkt. No. 52. The parties took substantial deposition testimony, including from the following witnesses: (i) Bellamy; (ii) Detective Gillen; (iii) Detective Solomeno; (iv) ADA Antignani; (v) ADA Guy; (vi) Michael Mansfield, the Director of the QCDA's witness protection program; (vii) Daniel Cox, the administrator of the QCDA's witness protection program responsible for Sanchez's participation; (viii) Sanchez; and (ix) Walker. We refer to the deposition testimony in detail in our forthcoming analysis of Bellamy's claims, but simply preview here that the deposition testimony, like the testimony at the § 440 proceeding, provides further, albeit at times conflicting, accounts of the circumstances surrounding Abbott's murder and the resulting investigation.

At the close of discovery on the claims against Detectives Solomeno and Gillen, both parties cross-moved for summary judgment. In an 80-page ruling, the district court granted summary judgment to Defendants dismissing Bellamy's claims against Detectives Solomeno and Gillen and dismissing the *Monell* claims on the pleadings. *Bellamy v. City of New York*, 2017 WL 2189528 (E.D.N.Y. May 17, 2017). First, the district court dismissed Bellamy's malicious prosecution claims against the detectives on the ground that Bellamy

failed to raise a triable issue of fact as to whether he was prosecuted without probable cause.[16] *Id.* at \*29–34. Second, it dismissed the core of Bellamy's due process and fair trial claims against Detectives Solomeno and Gillen upon concluding that Bellamy raised no material issue of fact as to whether either detective fabricated or withheld material evidence. *Id.* at \*34–36. Third, it dismissed Bellamy's "shocks the conscience" due process claims against the detectives as duplicative of Bellamy's malicious prosecution claims. *Id.* at \*36. Fourth, it dismissed Bellamy's intentional infliction of emotional distress claims against the detectives on the ground that Bellamy raised no triable issue as to whether the detectives conduct was "extreme and outrageous," and that, regardless, the claims were also duplicative of Bellamy's malicious prosecution claim. *Id.* at \*37. Finally, the district court dismissed Bellamy's *Monell* claims against the City on the pleadings for two reasons: (i) in light of *Van de Kamp v. Goldstein*, 555 U.S. 335 (2009), the City of New York cannot as a matter of law be liable for the alleged policies of the QCDA's office; and (ii) regardless, Bellamy did not sufficiently establish the underlying constitutional due process violations he alleged: the non-

---

[16] Later in its opinion, the district court also concluded that Detectives Solomeno and Gillen would have been protected by qualified immunity from Bellamy's malicious prosecution claims regardless. *Id.* at \*37.

disclosure of Sanchez's relocation benefits and ADA Guy's summation misconduct.[17]  *Id.* at *37–41.

Bellamy's appeal challenges only the dismissal of his due process and fair trial claims against Detectives Solomeno and Gillen and his *Monell* claims against the City of New York.  His baseline position is that (i) as to the claims against Detectives Solomeno and Gillen, the evidence as a whole (from the trial, the post-conviction hearing, and the depositions in the instant civil case), presents disputed issues of material fact that necessitate a trial, and (ii) with respect to the *Monell* claims, the district court committed legal error and that material fact issues remain as to the underlying conduct alleged.

## DISCUSSION

We review *de novo* both a grant of a summary judgment and the grant of judgment on the pleadings.  *Bank of New York v. First Millennium, Inc.*, 607 F.3d 905, 914, 922 (2d Cir. 2010).

Summary judgment may be granted only "if the movant shows that there is no genuine dispute as to any material fact and that the

---

[17] It does not appear that the Defendants moved for summary judgment on Bellamy's Count XII against the City of New York for *respondeat superior*, and the district court did not address the claim.  Regardless, Bellamy's *respondeat superior* claim depended on his establishing his state law tort claims, *see* Dkt. 1 ¶¶ 472–73, which the district court dismissed.  Bellamy does not appeal the dismissal of those claims, so this issue is not relevant.

movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). We may affirm the grant of summary judgment only when, in "resolv[ing] all ambiguities and draw[ing] all permissible factual inferences in favor of the [non-moving] party. . . the record taken as a whole could not lead a rational trier of fact to find for the non-moving party." *Estate of Gustafson v. Target Corp.*, 819 F.3d 673, 675 (2d Cir. 2016) (internal quotation marks omitted). Thus, in the present context and of significance here, where the summary judgment non-movant is a former criminal defendant bringing § 1983 claims related to his underlying criminal trial, the summary judgment standard, generally speaking, is the converse of the standard applicable direct appeal of a criminal defendant's conviction, which requires us to "view the evidence in a light that is most favorable to the government, and with all reasonable inferences resolved in favor of the government." *United States v. Anderson*, 747 F.3d 51, 60 (2d Cir. 2014) (internal quotation marks omitted).

A court may grant judgment on the pleadings only when, after "accept[ing] all factual allegations in the complaint as true and draw[ing] all reasonable inferences in favor of the [plaintiff] . . . the complaint [does not] contain sufficient factual matter . . . to state a claim to relief that is plausible on its face." *Bank of New York*, 607 F.3d at 922.

These principles lead us to conclude, contrary to the district court, that Bellamy has succeeded in raising material issues of fact as to a number of the claims subject to this appeal. This requires us to vacate in large part the dismissal of Bellamy's due process and fair trial claims against Detectives Solomeno and Gillen and to vacate in full the dismissal of Bellamy's *Monell* claims.[18]

**I.    Claims Against Detectives Solomeno and Gillen**

As we have previously discussed, Bellamy's claims against Detectives Solomeno and Gillen fall into two general categories: (i) claims that the detectives fabricated material evidence; and (ii) claims that the detectives withheld material evidence.

**a.  Evidence Fabrication Claims**

"When a police officer creates false information likely to influence a jury's decision and forwards that information to prosecutors, he violates the accused's constitutional right to a fair trial." *Ricciuti v. N.Y.C. Transit Auth.*, 124 F.3d 123, 130 (2d Cir. 1997). Bellamy contends that Detective Gillen and/or Solomeno fabricated three pieces of material evidence: (i) Bellamy's "murder" statement in the squad car; (ii) Walker's statement implicating Bellamy as recorded in a DD-5 drafted by Detective Solomeno; and (iii) Carter's

---

[18] The dissent posits views of the evidence that, if accepted by a trial jury, would likely result in a defendants' verdict. But it does so by drawing inferences against the plaintiffs and thus does not gainsay the existence of disputed issues of material fact that require a trial determination.

lineup identification of Bellamy. We conclude that Bellamy has raised material issues of fact precluding summary judgment as to the first two contentions, but not the third.

### i. Bellamy's "Murder" Statement in the Squad Car

The prosecution relied at trial on Detective Gillen's testimony regarding an undated and unsigned note that Detective Gillen contended that he wrote while in the squad car shortly after he picked up Bellamy. The note purportedly captured the following utterance from Bellamy: "This must be a case of mistaken identity—someone probably accused me of murdering someone." App'x 290. The note also supposedly transcribed the following squad car statement from Bellamy, which Detective Gillen only added to the note after returning to the precinct: "Why would someone accuse me of something I didn't do?" App'x 290, 2413. Sometime thereafter, Detective Gillen again added to the note the following: "Statement made by def while being asked his pedigree—spontaneous & unsolicited." App'x 1707. The prosecution relied heavily on this evidence at trial. Detective Gillen, the state's first witness, testified at length regarding Bellamy's purported murder statement in the squad car, which Gillen allegedly memorialized in a handwritten note in his police spiral notebook. Trial Tr. 494–96, 529. ADA Guy relied on Bellamy's purported murder statement in summation, Trial Tr. 1124. The prosecution's reliance on this statement is unsurprising because,

if Bellamy made it, it is highly inculpatory. No one mentioned Abbott's murder to Bellamy when he was picked up, and from Bellamy's perspective, all indications were that the detectives were detaining Bellamy solely for consuming alcohol in public.

Bellamy has consistently denied making the "murder" statement, including in his deposition in this case, and asserts as part of his fair trial claim that it was wholly fabricated by Detective Gillen.[19] In a brief analysis, the district court rejected the claim, relying on *Jeffreys v. City of New York*, 426 F.3d 549 (2d Cir. 2005), for the proposition that self-serving deposition testimony that is "unsubstantiated by any other direct evidence" cannot raise an issue of material fact. 2017 WL 2189528, at *31.

We conclude, contrary to the district court, that Bellamy has raised a material issue of fact as to whether Detective Gillen fabricated the note purportedly memorializing Bellamy's "murder" statement in the squad car. Contrary to the district court's analysis, a § 1983 plaintiff's testimony alone may be independently sufficient to raise a genuine issue of material fact. *See, e.g.*, *Rentas v. Ruffin*, 816 F.3d 214, 221 (2d Cir. 2016). *Jeffreys* is inapposite because the self-serving

---

[19] Bellamy affirmatively denies making the "murder" statement but takes a softer stance as to the "accuse" statement, stating he cannot remember making it but that if he did it was "probably . . . after they . . . put the [photo of the] bloody guy on the table and told me that two people said they seen me kill somebody." Bellamy Dep. Tr. 145–47.

testimony in that case was "contradictory and incomplete," and "so replete with inconsistencies and improbabilities that no reasonable juror would undertake the suspension of disbelief necessary to credit the allegations." 426 F.3d at 555. Here, Bellamy's testimony was consistent and uncomplicated: he never made the statement. Neither is his testimony wholly improbable: why would Bellamy offer such an admission when he was told only that he was being picked up on a public drinking charge?

Further distinguishing this case from *Jeffreys* is that there is evidence in the record, independent from Bellamy's unequivocal denial, tending to support an inference of fabrication. The DD-5 that Detective Gillen drafted that summarized the circumstances of Bellamy's pickup makes no mention of the "murder" statement, despite the fact that the DD-5 both identified that Bellamy was being investigated for homicide and that Detective Gillen was specifically investigating the Abbott murder when he went to pick up Bellamy. *See* App'x 1738; *see also* Trial Tr. 491. At trial, Detective Gillen will no doubt be asked to explain this omission from the DD-5. In so doing, he may repeat the explanation he offered at a pre-trial hearing that the omission was "basically an oversight." App'x 2411. The jury will be free, however, to weigh that assertion against evidence that NYPD detectives commonly understand that DD-5s are to be used at trial and that it is protocol for a suspect's statements to be incorporated

into a DD-5, especially statements as significant as those that Detective Gillen attributes to Bellamy. *See* Solomeno Dep. Tr. 27–28; Guy Dep. Tr. 79, 126–27; *see also* Trial Tr. 532–33 (Gillen testimony that he prepared eight DD-5s related to the Abbott murder investigation alone).

The jury will also be free to weigh other evidence tending to undermine Detective Gillen's testimony that Bellamy made the "murder" statement in the police car, such as the fact that Detective Gillen did not identify this statement during his grand jury testimony, *see* App'x 336–38, and the fact that the record shows that Detective Gillen, who was in the backseat with Bellamy, said that Bellamy "yell[ed]" the "murder" statement but neither of the two other officers who were in the car was asked to—or did—corroborate his story. Both of those detectives testified at trial and neither mentioned the "murder" statement. Gillen Dep. Tr. 53; Trial Tr. 495. In sum, the jury would be entitled to consider the lack of corroboration of Detective Gillen's testimony.[20]

---

[20] Defendants assert support for the accuracy of Gillen's transcription of the "murder" statement in the form of ADA Antignani's notice served to Bellamy pursuant to N.Y. Crim. Proc. Law § 710.30 two days after Bellamy was picked up, which notifies Bellamy of the state's intent to rely on the "murder" statement at trial. App'x 1610. Even if this fact could support an inference that the Gillen transcription was accurate, it just as easily supports the inference that ADA Antignani simply relied on Gillen's fabricated note.

We conclude that, taken as a whole, the evidence compiled at summary judgment, viewed in the light most favorable to Bellamy, cannot rule out the inference that Detective Gillen fabricated the "murder" statement. Bellamy has therefore raised a material issue of fact precluding summary judgment on this fair trial claim.

### ii. DD-5 Documenting Walker Interview

On December 1, 2005, while Bellamy's criminal trial was ongoing, Detectives Solomeno and Gillen for the first time interviewed Veronica Walker, who, as discussed, testified at trial that she had been at the scene in her car when Abbott was killed. Following that interview, Detective Solomeno drafted a DD-5 that, he testified, memorialized Walker's statements and forwarded the DD-5 to ADA Guy. Bellamy contends that Detective Solomeno fabricated the statements inculpating Bellamy attributed to Walker in that DD-5, and that the state materially relied on the fabricated DD-5 at trial. We conclude that the summary judgment record, again taken in the light most favorable to non-movant Bellamy, raises a material issue of fact as to whether Detective Solomeno in fact fabricated the evidence contained in the DD-5.

At her deposition, Walker testified in detail about her mid-trial interview with Detectives Solomeno and Gillen. Walker testified that the detectives told her they received her contact information from Deborah Abbott, the victim's sister, and that Deborah had reported to

them that she had a conversation with Walker in which Walker said she witnessed Bellamy kill Abbott. Walker testified that she told the detectives that the story was not true, but the detectives continued to insist to her that she witnessed Bellamy murder Abbott. Detective Solomeno then showed Walker two photos of Bellamy, whom she told the detectives she recognized and had seen over 300 times in her life. Walker testified that she repeatedly told the detectives, however, that it was *not* Bellamy that she saw on the day of the Abbott murder. She testified that, despite those statements, Detective Solomeno drafted the following handwritten statement directly to the contrary and asked Walker to sign it:

> Miss Walker stated that she drove past the two males fighting and that when . . . she looked back and then saw another male black she knew as Kareem Bellamy also fighting with James [Abbott] and that Kareem and the other male black were kicking and punching James.

App'x 2128–29. Walker swore that she refused to sign the statement because, in her view and consistent with her repeated statements to the detectives, it was not true. As she explained in her deposition:

> I read the whole thing and that is not what it stated that I said. It stated that I witnessed Kareem, that I seen Kareem and that is what I was saying to them and that's the reason why I didn't sign it because I did not see him.

Walker Dep. Tr. 40. Walker repeatedly characterized the statement as "lies," Walker Dep. Tr. 127–31, the same position she took years earlier when testifying at Bellamy's § 440 proceeding. First 440 Tr. 97 ("Absolutely not. Never told them that.").

While Detectives Solomeno and Gillen both insist the statement was true, they concede that Walker refused to sign the statement that Detective Solomeno drafted during their December 1, 2005 interview. Solomeno Dep. Tr. 42–43; Gillen Dep. Tr. 191. Detective Solomeno acknowledges that he nevertheless put the "almost word for word" statement in a DD-5, but failed to disclose in the DD-5 that Walker refused to sign it (as he concedes he "should have" done), and that he gave the DD-5 to ADA Guy, again without revealing to the prosecutor that Walker refused to sign the statement. Solomeno Dep. Tr. 143–45. ADA Guy testified that he was unaware of any of this and characterized the allegations of the concealment of the refusal to sign as "very troubling," and, if true, "reprehensible." Guy Dep. Tr. 117.

Significantly, the Defendants do not dispute that the above evidence at the least raises an issue of fact as to whether Detective Solomeno fabricated the Walker statement and forwarded it to ADA Guy. *See* Br. of Appellees 44–46. Their sole argument in favor of dismissal of this evidence fabrication claim is that the allegedly false DD-5 was immaterial in that it did not impact Bellamy's criminal trial because it was not introduced into evidence and, at trial, Walker did

not identify Bellamy.  For support, they rely on *DuFort v. City of New York*, 874 F.3d 338 (2d Cir. 2017), where we concluded that "[m]ere attempts to withhold or falsify evidence cannot form the basis of a § 1983 claim for violation of the right to due process when those attempts have no impact on the conduct of a criminal trial." *Id.* at 355. We find *DuFort* readily distinguishable.

*DuFort* involved a "paradigmatic example of an improperly suggestive lineup," in which detectives allowed a criminal suspect, DuFort, to wear a red sweatshirt during a lineup despite knowing that the sole eyewitness, Park, had told them that, although she could not identify his face, one of the assailants was wearing a red sweatshirt during the commission of the crime. *Id.* at 348.  Park then selected DuFort out of the lineup but did so based solely on her knowledge that the assailant was wearing a red sweatshirt.  During the subsequent criminal trial of DuFort, Park could not identify DuFort and testified that she only selected DuFort at the lineup due to his distinctive clothing. *Id.*

DuFort was acquitted and sued the detectives claiming that their manipulation of the lineup violated his right to a fair trial.  We rejected the claim, noting that evidence fabrication claims rest on "the right to have one's case tried based on an accurate evidentiary record that has not been manipulated by the prosecution." *Id.* at 355.  We concluded that there was no such defect in DuFort's trial record in

light of Park's unequivocal and unchallenged testimony to the jury that she only identified DuFort because of his clothing: "the evidence that DuFort claims was withheld or misrepresented was in fact disclosed in a straightforward manner at the trial: the prosecution elicited testimony from [the witness] that she recognized DuFort not by his face, but by his clothing." *Id.* Consequently, in *DuFort*, the jury was presented with the full universe of information, despite any earlier police misconduct. Indeed, we noted that it was "undisputed that [the] attempt [to distort the trial record] failed." *Id*.

*DuFort* is far afield from the instant case because it is not clear (and certainly not undisputed) that Detective Solomeno's allegedly false DD-5 report had "*no* impact on the conduct of [Bellamy's] criminal trial." *DuFort*, 874 F.3d at 355. (emphasis added). Although Walker did not identify Bellamy as the assailant at trial, there was an unacceptable risk, due only to the allegedly fabricated DD-5, that the jury was left with the potentially incorrect impression that she had done so previously. During Solomeno's testimony, ADA Guy elicited the fact that Solomemo had prepared a DD-5 to memorialize the interview with Walker. Trial Tr. 802. While ADA Guy did not introduce the DD-5 into evidence, he then asked Walker during her testimony, "didn't you tell Detective Solomeno and Detective Gillen that you recognized that person as Kareem?" Trial Tr. 1005. Despite Walker's response of "No," the jury could have viewed ADA Guy's

question itself as suggesting that Walker did in fact tell the detectives that it was Bellamy she saw and that ADA Guy had a good faith basis for asking the question. And ADA Guy would have had no basis to ask that question if Detective Solomeno had not provided him with the allegedly fabricated DD-5. We have previously noted that, in contexts such as these, "defense counsel's unanswered questions about prior inconsistent statements [may] likely alert[] the jury to the issue of the reliability of [the] testimony," and, even where "the jury was told that the lawyer's questions are not evidence . . . the sting survives such instructions." *See Washington v. Schriver*, 255 F.3d 45, 61 (2d Cir. 2001) (internal quotation marks omitted).[21] Significantly, ADA Guy then closed the loop in summation when he argued to the jury that it should take stock of what Walker said in her interview with Detectives Solomeno and Gillen. Trial Tr. 1122–23; *see also* Trial Tr. 1144.[22]

Further evidence supports the material impact of the Walker DD-5 on Bellamy's conviction. After the trial, ADA Guy stated that

---

[21] To analogize to *DuFort*, it would be as if DuFort's prosecutor asked Park: "Isn't it true that you told the detectives that you recognized DuFort wholly apart from his clothing?" But DuFort's prosecutor asked no such thing.

[22] An illustration of the potential for confusion caused by Walker's testimony is that, in resolving Bellamy's petition for *habeas corpus*, the federal district court incorrectly stated that at trial "[t]hree witnesses identified petitioner as present at [t]he scene of the murder." App'x 613.

the DD-5 was "most helpful" to the prosecution. App'x 1752. As he wrote in a post-trial "commendation letter" to NYPD Commissioner William Bratton praising Detectives Solomeno and Gillen's conduct specifically with respect to the Walker DD-5:

> [Detectives Solomeno and Gillen] also helped locate a previously unknown (second) eye-witness to the murder and interviewed her in the midst of my trial, and helped secure her appearance, too. She proved to be fairly uncooperative, *but because your detectives had prepared a detailed DD-5 of their conversation with her, she had less "wiggle" room, and in the end what she had told the detectives proved most helpful.*

App'x 1752 (emphasis added). It is therefore plain that ADA Guy, for his part, thought that the DD-5 provided to him by Detective Solomeno was material to Bellamy's conviction. *See also* Guy Dep. Tr. 208 (testifying that he only sent commendation letters "from time to time in a case that I thought merited a little pat on the back . . . Not many, more than just two or three"). Finally, it bears noting that the jurors apparently attached significance to Walker's testimony because that testimony prompted their only request for a second readback of particular testimony during deliberations. *See* Trial Tr. 1209, 1224–26. Under these circumstances, we find that there is "an overwhelming probability that the jury [was] unable to follow the court's instructions" that the lawyers' questions are not evidence, and "a strong likelihood that the effect of the evidence [was] devastating to

the defendant." *Greer v. Miller*, 483 U.S. 756, 766 n.8 (1987) (citation omitted).

Of course, it is entirely possible that Walker implicated Bellamy to the detectives and that her later denials were false, and that Detective Solomeno simply prepared a truthful DD-5 that Walker refused to sign. But this is a quintessentially disputed fact issue, as neither side contests, and it is a material one, as the record shows. We therefore conclude that, notwithstanding *DuFort*, Bellamy has raised a material issue of fact as to the truth or fabrication of the contents of the DD-5 purportedly memorializing Detectives Solomeno and Gillen's December 1, 2005 interview with Walker.

### iii.  Carter's Lineup Identification

Bellamy contends that Detective Gillen pressured Carter to identify Bellamy in the lineup that took place on May 14, 1994. Specifically, Bellamy contends that Carter initially was indecisive about whether the assailant was in position one or two, but that Carter was then taken to another room with Detective Gillen where Detective Gillen proceeded to put pressure on Carter to identify the individual in position one, which Carter ultimately did.

The sole direct evidence supporting this claim appears to be Carter's testimony at Bellamy's § 440 proceeding, in which Carter, in recanting his trial testimony, testified that Detective Gillen pointed out Bellamy at the lineup and pressured Carter to identify him.

Subsequent to that testimony, however, Carter died, and Bellamy concedes that Carter's testimony at the § 440 proceeding will not be admissible at trial.  Br. of Appellant at 24 n.10.  And, it is axiomatic that, when reviewing a summary judgment determination, we may only consider admissible evidence. *See Ehrens v. Lutheran Church*, 385 F.3d 232, 235 (2d Cir. 2004) (per curiam). Bellamy therefore relies only on a claimed inference in his attempt to raise a genuine issue of fact as to whether Detective Gillen pressured Carter at the lineup. Bellamy focuses on two aspects of Detective Gillen's testimony: (i) that Detective Gillen told Bellamy to pat down his braids prior to the lineup; and (ii) that Carter then told Detective Gillen that the basis of his confusion as to whether the assailant was in position one or two was the braided hair of the individual in position one.  Consequently, Bellamy contends that it is "likely [that Gillen] suggested to Carter the braids explanation for why he had failed to recognize Number 1."  Br. of Appellant at 41.  This contention is pure speculation and is therefore insufficient to raise a triable issue of fact. *See Harlan Assocs. v. Inc. Village of Mineola*, 273 F.3d 494, 502 (2d Cir. 2001).  We affirm the district court's dismissal of this claim of misconduct.

### b.  Evidence Withholding Claims

When police officers withhold exculpatory or impeaching evidence from prosecutors, they may be held liable under § 1983 for violating the disclosure requirements of *Brady v. Maryland*, 373 U.S.

83 (1963).[23] *See Bermudez v. City of New York*, 790 F.3d 368, 376 n.4 (2d Cir. 2015) (citing *Walker v. City of New York*, 974 F.2d 293, 299 (2d Cir. 1992)).   To prevail on such a claim, a plaintiff must show the materiality of the nondisclosed evidence, a showing that "does not depend on factual innocence, but rather what would have been proven absent the violation . . . [with] reference to the likely effect that the suppression of [the] particular evidence had on the outcome of the trial." *Poventud v. City of New York*, 750 F.3d 121, 134 (2d Cir. 2014) (*en banc*) (internal quotation marks and emphasis omitted).   Stated differently, to show prejudice the claimant "must demonstrate a reasonable probability that, had the evidence been disclosed, the result of the proceeding would have been different."   *United States v. Ulbricht*, 858 F.3d 71, 112 (2d Cir. 2017) (internal quotation marks omitted).  For example, a § 1983 plaintiff proceeding on a *Brady* theory

---

[23] We have suggested, though without so concluding, that a civil *Brady* claim requires a showing that the non-disclosure was intentional.  *See Fappiano v. City of New York*, 640 F. App'x 115, 118 (2d Cir. 2017 (summary order); *see also Darnell v. Pineiro*, 849 F.3d 17, 36 (2d Cir. 2017).   Even assuming such an intent requirement, we have no need to specifically address, at this stage, the detectives' intent as to each of the alleged *Brady* violations here.   This is because of the evidence in the record, already discussed, that raises material issues of fact as to whether Detective Solomeno and Gillen's conducting of the Abbott investigation was improper.  *See Manganiello v. City of New York*, 612 F.3d 149, 164 (2d Cir. 2010) (permitting an inference of a detective's malice because, "in light of the other evidence as to [the detective's] conduct of the investigation, [the jury would be entitled] to view [the detective's] misrepresentation as indicative of [his] state of mind all along").

can succeed on his claim if, had the withheld information been disclosed prior to trial, "he would have been acquitted based on reasonable doubt or convicted on a lesser charge." *Poventud*, 750 F.3d at 134–35.

Bellamy contends that Detectives Solomeno and Gillen violated *Brady* by failing to disclose to prosecutors four categories of exculpatory or impeaching statements made by Sanchez and Walker during the course of the investigation of the Abbott murder: first, that in the weeks following the murder, Sanchez told Detective Gillen that she saw Bellamy in the C-Town trying to buy beer on a day in which C-Town did not (and legally could not) sell beer before noon, which could only have been a Sunday (rather than a Saturday, the day Abbott was killed); second, that Sanchez identified Terrill Lee to Detective Gillen as the person that she saw with Bellamy in the C-Town on the morning of Abbott's murder; third, that on the day of Abbott's murder Sanchez told Detective Gillen that she "didn't see anything" and "didn't know anything"; and fourth, Detectives Solomeno and Gillen failed to disclose Walker's claimed non-identification of Bellamy at her December 1, 1995 interview as well as her refusal to sign the DD-5 attesting that she had so identified Bellamy. We address each in turn.

**i.  Sanchez's Sunday/Beer Statement**

Bellamy contends that Detectives Solomeno and Gillen failed to disclose to the prosecution statements Sanchez made to them during the investigation of the Abbott murder that the day in which she reported seeing Bellamy in the C-Town with Abbott was a Sunday and a day in which the C-Town could not have lawfully sold beer prior to noon (which could only have been a Sunday).  *See* N.Y. Alco. Bev. Cont. Law § 105-a (1971) (amended 2006).  It is undisputed that Abbott was killed on Saturday, April 9, 1994.  Although Sanchez's several rounds of testimony in this legal saga have been consistently inconsistent, Sanchez more than once testified that she told detectives

that she saw Bellamy on a Sunday.[24]  During Bellamy's § 440 proceeding, she repeatedly testified that Bellamy was trying to buy beer on a Sunday when he could not, and agreed that she "first told police that [she] saw Kareem Bellamy on a Sunday."  First 440 Tr. 458–

---

[24] Sanchez's testimony as to which day she remembered seeing Bellamy has been, at best, confused.  At the grand jury, she testified that Bellamy bought beer on the day in question.  App'x 320–23.  And at trial, she was asked "[w]hat first caused you to notice the defendant inside that C-Town that morning," to which she responded, "[h]e was buying beer."  Trial Tr. 641.  But, ADA Guy followed up with, "[d]id anything direct your attention to the defendant that morning," to which Sanchez responded, "[h]e was buying beer on a Sunday—on a Saturday that day."  Trial Tr. 642.  This self-correction is curious, however, because it begs the question why it would have been notable for Sanchez to notice that Bellamy was specifically buying beer *on a Saturday*.  Sanchez sowed further confusion during the § 440 proceeding, where she unequivocally testified that, on the day of the murder, Bellamy "was trying to buy beer on a day he couldn't buy beer," clarified that that day was a Sunday, and recalled that the C-Town manager even told Bellamy that "you can't buy beer."  First 440 Tr. 453–60, 490–91.  Her story got more confusing at her deposition in this case, when she continued to adamantly assert that she saw Bellamy on "a day that you couldn't buy beer," but also that she was certain that the day was a Saturday (a day in which you could buy beer).  Sanchez Dep. Tr. 24–27.  Sanchez then testified, for the first time, that she specifically remembers it being a Saturday because she "freshen[ed] up [her] memory and speaking to the members of [her] family it was a Saturday because [a family member named Julio] was outside mechanicking on the block."  Sanchez Dep. Tr. 26–27.  She even testified that "I told [my family] it was Sunday [and] they said no Linda, it wasn't Sunday it was Saturday . . . the guy Julio was outside mechanicking and he remember clearly it was Saturday."  Sanchez Dep. Tr. 139–40.  Despite accepting her family's correction that it was a Saturday, Sanchez nevertheless vividly remembered that Bellamy was trying to buy beer on a day that C-Town could not sell beer.  Indeed, she remembered that Bellamy was upset because he could not buy beer, "I just know he had a look on his face, just body language."  Sanchez Dep. Tr. 37.

59.  She reaffirmed this testimony in her deposition in this case, testifying that "[a]t some point" she told Detective Gillen that Bellamy was trying to buy beer on the same morning of the murder and that the manager told Bellamy that he could not do so.  Sanchez Dep. Tr. 37.  Although both detectives deny any recollection of these statements by Sanchez, First 440 Tr. 912–13; Gillen Dep. Tr. 162–65; Solomeno Dep. Tr. 116–17, Sanchez's testimony both at the § 440 proceeding and her deposition create a triable question of fact as to whether the statements were made to either of the detectives (and not disclosed to the prosecution).

The question then becomes one of materiality.  We believe that disclosure of the above statements would have significantly increased the defense's chances of sowing a reasonable doubt in the jury's mind about Bellamy's guilt.  As identified in detail, *see infra* note 24, Sanchez, a key state witness, has consistently held the inconsistent positions that she is certain that the morning she saw Bellamy in the C-Town was a day in which the C-Town could not lawfully sell beer, but also that the morning was a Saturday.  Had defense counsel been able to impeach Sanchez with that obvious inconsistency in front of the jury it would have been of great value to the defense, given how relatively thin the overall evidence was against Bellamy.

Indeed, both ADAs Guy and Antignani, as well as Detective Solomeno, conceded in their depositions the materiality of any

statements by Sanchez that she saw Bellamy on a day in which the C-Town could not lawfully sell beer. ADA Guy testified that, if he had known about them, he would have likely turned over such statements precisely "so that the defense attorney could explore her confusion as to the date." Guy Dep. Tr. 127. He continued: "if [Sanchez] remembered that it was a Sunday because you're not allowed to sell beer on a Sunday before noon, that might give more credence to it," and "[i]f she had said that to Detective Gillen . . . [he] presumably would have written that in the DD-5." Guy Dep. Tr. 126–27. Detective Solomeno also agreed, evidenced by his deposition testimony that if he had heard Sanchez make these statements he would have recorded them. Solomeno Dep. Tr. 117. As did ADA Antignani, who testified at his deposition that "if in fact, Linda Sanchez said that to John Gillen, then I think John Gillen should have said it." Antignani Dep. Tr. 86–87.

We therefore conclude that there is sufficient evidence from which a jury could reasonably determine that the nondisclosure of the Sanchez Sunday/beer statements, if they were made to the detectives (another jury question), were actionable *Brady* violations. Bellamy has therefore raised a triable issue of fact as to this allegation.

### ii. Sanchez's Identification of Terrill Lee

Bellamy contends that Detective Gillen failed to disclose that, during the investigation, Sanchez identified Terrill Lee as the

individual with Bellamy in the C-Town on the day of Abbott's murder. The contention centers on Sanchez's testimony during Bellamy's § 440 proceeding in which she testified that, following the lineup, a detective showed her a Polaroid photo of Lee, whom she then identified to the detective as the person she saw with Bellamy in the C-Town on the morning of Abbott's murder.[25] First 440 Tr. 468; *see also* Gillen Dep. Tr. 170 (discussing that Lee had a Polaroid taken at the precinct).

The parties dispute whether Detective Gillen showed Sanchez a photo of Lee (and thus whether Sanchez identified Lee to Detective Gillen). Although Sanchez so testified at the § 440 proceeding, she subsequently did not recall being shown Lee's photo when testifying at her deposition in this case. Sanchez Dep. Tr. 45–46. However, despite her lack of recollection then (seven years later, and more than twenty years from the alleged incident), she also testified that she had no reason to think she did not tell the truth when she so testified at

_____

[25] Defendants contend that the evidence cannot establish that Detective Gillen was the "detective" that Sanchez referenced when she was purportedly shown the Lee photo. Br. of Appellees at 53 (relying on the fact that Sanchez's testimony only uses the pronoun "they"). The argument is meritless. Sanchez made clear that it was "one" of the "detective[s]" who showed her the photo "after the lineup." First 440 Tr. 468. And the record makes plain that Detective Gillen was the only detective at the lineup and that he oversaw the lineup. *See* Trial Tr. 502–09; App'x 293; First 440 Tr. 1109. At the very least, we would be required at this stage to infer that Sanchez's testimony referenced Detective Gillen. Ultimately, however, the question is for the jury to decide.

the § 440 proceeding.  Sanchez Dep. Tr. 45–46.  While Detective Solomeno and ADAs Antignani and Guy each testified that someone *should have* shown Lee's photo to Sanchez, Solomeno Dep. Tr. 169; Antignani Dep. Tr. 122–23; Guy Dep. Tr. 76–77, Detective Gillen and ADAs Antignani and Guy each testified that they did not show Sanchez a photo of Lee and that they do not know if anyone else did. First 440 Tr. 865, 877 (Gillen); First 440 Tr. 1111, 1151–52, 1164, 1165 (ADA Antignani); First 440 Tr. 1178, 1210–11 (ADA Guy); Gillen Dep. Tr. 170.

Although a close question, we conclude that Bellamy has raised a genuine disputed issue of fact as to whether Sanchez told Detective Gillen that Lee was the individual with Bellamy (and therefore whether Detective Gillen failed to disclose such).  *See Del. & Hudson Ry. Co. v. Consolidated Rail Corp.*, 902 F.2d 174, 177–78 (2d Cir. 1990) (summary judgment non-movant need only demonstrate "that there is some evidence which would create a genuine issue," meaning "more than a scintilla of evidence" and "more than some metaphysical doubt as to the material facts" (internal quotation marks omitted)).

The district court came to no conclusion as to the state of the factual record on this allegation, and rather concluded that "even if Sanchez had identified [Lee] as the plaintiff's companion, it is difficult

to see how that would have been helpful to [Bellamy]." 2017 WL 2189528, at *36. We disagree.

Because the record makes plain that the detectives had no suspicions that Lee was involved in the Abbott murder, *see* Gillen Dep. Tr. 170–71; *see also* Antignani Dep. Tr. 146–47; Guy Dep. Tr. 69–72, any identification of Lee by Sanchez as being in the C-Town with Bellamy would seriously undermine the reliability of Sanchez's placement of Bellamy in the store on the morning of Abbott's murder. If Lee was not with Bellamy on the morning in question—as the detectives seemingly concluded—and if Bellamy was with Lee at the time Sanchez had in mind during her trial testimony, Sanchez must have been confused about which morning she saw Bellamy, a not unlikely possibility, as previously discussed in depth, *see infra* note 24, and as one particular exchange highlights.[26] And Sanchez's identification of Lee to Detective Gillen would be material even if Sanchez was wrong about her identification of Lee because it would call into question Sanchez's general recollection of the morning of the

---

[26] "Q: [Y]ou had seen two people that Sunday? A: Yes. Q: Correct. When you say the other guy are you referring to the other guy you saw that Sunday? A: The other guy that was with Kareem . . . . Q: Where you shown a photograph of this other guy? A: Yes. Q: Okay. And what did—what kind of photograph was it? A: It's a Polaroid . . . . Q: So they told you that the person in the photograph was Terrell Lee? A: Yes. Q: Well, just—I just want to be clear. And you told them that the person in that Polaroid photo who they told you was Terrell Lee was the person you saw together with Kareem; is that correct? A: Yes." 440 Tr. 464–68.

Abbott murder, including her identification of Bellamy.  Either way, had the defense known that Sanchez had at one point contended that Lee was the person with Bellamy on the morning of the murder, the defense would have had an important additional tool of cross-examination.

Consequently, viewing the evidence in Bellamy's favor as we must at this stage, we think that Bellamy has raised a genuine issue of material fact as to whether Detective Gillen, in violation of *Brady*, failed to disclose Sanchez's identification of Lee.

### iii. Sanchez's Didn't Know/See Anything Statements

Bellamy contends that Detective Gillen failed to disclose statements Sanchez made on the morning of the Abbott murder that she "didn't know anything" and "didn't see anything."  Bellamy grounds this contention on Sanchez's testimony at Bellamy's § 440 proceeding, where Sanchez testified that on the morning of Abbott's murder, certain detectives (including Detective Gillen) "came in the [C-Town] supermarket.  I didn't speak to them they just came in and they said do you know anything.  I said no . . . I said no, I didn't know anything."  First 440 Tr. 453; *see also* First 440 Tr. 459 (Sanchez agreeing with the statement that "the police came in on the day of the murder and [she] said [she] didn't see anything").  These *de minimis* statements, even if they were made (recall that, at trial, Sanchez

denied speaking with officers the morning of the murder), are manifestly immaterial principally because nothing in the record shows that Sanchez had any reason to think that anything was afoot when Detective Gillen first entered the C-Town that morning. Indeed, Sanchez testified at trial that she did not learn of Abbott's murder until a week later. Trial Tr. 745; *see also* Trial 652–53.[27] Consequently, at that time, from her perspective, Sanchez did not "know" or "see" anything out of the ordinary. Disclosure of these statements would therefore not have served to materially impeach Sanchez or exculpate Bellamy. We affirm the district court's dismissal of this *Brady* contention.

### iv. Walker's December 1, 2005 Statements

Apart from Bellamy's claim that Detective Solomeno fabricated the contents of the DD-5 purportedly memorializing the December 1, 2005 interview of Veronica Walker, *see infra* at pp. 39–46, Bellamy also brings a *Brady* claim challenging Detectives Solomeno and Gillen's

---

[27] Bellamy contends that Sanchez "*admitted* she learned of Abbott's murder 'when the cops came inside the C-Town to ask questions' about Abbott." Br. of Appellants 44. But, Sanchez's testimony makes clear that she only learned about any incident of note from JJ, the C-Town deli clerk, who told her about the subject of the officers' visit only *after* "the cops were already gone." First 440 Tr. 493. Consequently, although Sanchez's testimony has been inconsistent as to whether she first learned of the Abbott murder on the day of April 9, 1994 or in the week thereafter, there is no evidence that she knew of the incident prior to interacting with detectives on the morning of April 9.

failure to disclose the statements he claims that Walker actually did make during that interview. *See* App'x 62 ¶¶ 183–200; App'x 93 ¶ 379. Most principally, Bellamy challenges the detectives' failure to disclose what Walker testified were her unequivocal statements that Bellamy was *not* the person she saw on the morning of Abbott's murder, as well as Walker's refusal to sign Detective Solomeno's DD-5 because the contents, in her view, were not true.

The Defendants did not seek summary judgment on this claim, *see* App'x 734–38, and therefore it was error for the district court to have dismissed it without providing Bellamy "notice and a reasonable time to respond." Fed. R. Civ. P. 56 (f)(2). This is sufficient by itself to vacate the district court's dismissal of this claim.

We would arrive at the same outcome even if the Defendants had sought summary judgment on this claim. For similar reasons that we concluded that Bellamy has raised a triable issue of fact as to his evidence fabrication claim premised on the DD-5 following the Walker interview, we conclude that Bellamy has raised a triable issue as to the related *Brady* claim. Walker's testimony raises a genuine disputed issue as to whether Walker affirmatively told the detectives that the individual she saw was *not* Bellamy, and both detectives admit that Walker refused to sign the DD-5 and that they did not tell ADA Guy that she had so refused. If her denial existed from the outset (which we hold to be a jury question), then its disclosure would

have weakened ADA Guy's examination while permitting the criminal defense team to refresh Walker's recollection as to whether earlier she firmly denied seeing Bellamy, a fact that did not come out at trial. Thus, this claim even if it had been challenged at summary judgment, should not have been dismissed.

**II.   *Monell* Claims Against the City of New York**

We now turn to whether the district court properly dismissed Bellamy's § 1983 claims against the City of New York. Although § 1983 subjects only "person[s]" to liability, 42 U.S.C. § 1983, *Monell* established that "a municipality [such as the City of New York] is a person within the meaning of Section 1983," *Vives v. City of New York*, 524 F.3d 346, 350 (2d Cir. 2008). To establish liability under *Monell*, a plaintiff must show that he suffered the denial of a constitutional right that was caused by an official municipal policy or custom. *See Wray v. City of New York*, 490 F.3d 189, 195 (2d Cir. 2007).

As relevant here, Bellamy proffers two theories of *Monell* liability: (i) the prosecution failed to disclose the full relocation benefits Sanchez received from the QCDA's office, a *Brady* violation that was caused by a deliberate information barrier imposed by the QCDA that purposefully kept prosecutors unaware of the full benefits received by witnesses in its witness protection program ("WPP"); and (ii) ADA Guy's improper summation was a due process violation caused by the QCDA office's failure to discipline

summation misconduct.[28]   The City challenges Bellamy's *Monell* claims on two general grounds: (i) the City is not responsible as a matter of law under *Monell* for the alleged policies of the QCDA; and (ii) regardless, Bellamy did not sufficiently establish underlying due process violations to withstand summary judgment.[29]   We disagree with both contentions and vacate the district court's dismissal of Bellamy's *Monell* claims.

---

[28] Bellamy also pled a claim that the QCDA's office failed to discipline *Brady* violations, specifically as to its prosecutors' failure to diligently search out the benefits received by its witnesses.  Defendants did not specifically move for summary judgment on this claim and the district court did not address it, which means that its dismissal was improper.  *See* Fed. R. Civ. P. 56(f)(2).  Bellamy affirmed on appeal his intention to proceed on this claim, yet Defendants did not address it in their brief.  *See* Br. of Appellant 48 n.15; Reply Br. of Appellant 11 n.5.  We decline to address this claim in the first instance.

[29] Whether the QCDA in fact had the challenged policies is not at issue before us.  Following the denial of the Defendants' motion to dismiss, the district court bifurcated discovery on Bellamy's non-*Monell* and *Monell* claims by allowing the completion of non-*Monell* discovery but limiting *Monell* discovery to "the question whether any of the plaintiff's federal constitutional rights were violated by the actions of the district attorney's office."  Dkt. No. 52.  Although the parties subsequently stipulated to proceed to full discovery on Bellamy's *Monell* claims, Dkt. No. 112, including as to the existence of the alleged policies, the district court subsequently re-imposed the discovery stay before Bellamy took any *Monell* depositions pending resolution of the parties' summary judgment motions.  *See* Dkt. No. 152.  Consequently, Bellamy has yet to have full discovery as to the existence of the alleged policies, and the City makes no argument regarding the existence of the policies on appeal.

### a.  The City of New York's Liability Under *Monell* for the Alleged Policies of the QCDA's Office

The City argues that it cannot be held liable as a matter of law for any constitutional harms inflicted by the alleged policies of the QCDA's office that give rise to Bellamy's *Monell* claims because those were not policies for which the City is responsible.  The district court agreed, but we do not.

*Monell* liability attaches only where an infringement of constitutional rights is caused by a local government policy.  *See Outlaw v. Hartford*, 884 F.3d 351, 372–73 (2d Cir. 2018).  In searching for the proper *local* government that is subject to liability on a given *Monell* claim we look for "those official or governmental bodies who speak with final policymaking authority . . . concerning the action alleged to have caused the particular . . . violation at issue."  *Jett v. Dallas Ind. Sch. Dist.*, 491 U.S. 701, 737 (1989).  The issue for us is thus whether the City of New York is the "final policymaking authority" in relation to the alleged QCDA policies at issue here:  the WPP information barrier and the failure to discipline summation misconduct.  The City argues, as the district court concluded, that pursuant to *Van de Kamp v. Goldstein*, 555 U.S. 335 (2009), the challenged conduct of the QCDA's office is necessarily a function of *state* policies, and therefore the City may not be subject to *Monell* liability as a matter of law.  We think this argument overextends *Van*

*de Kamp*, a case assessing the distinct doctrine of prosecutorial immunity, and that our controlling precedent plainly establishes that the City may be held liable under *Monell* for the alleged QCDA policies at issue.

On numerous occasions we have been called upon to assess how plaintiffs may pursue claims under *Monell* that allege that policies of prosecutors' offices led to infringements of their constitutional rights.  To adequately explain why we conclude that the City is a proper defendant with respect to Bellamy's *Monell* claims here, a brief review of these cases will be helpful.

In *Baez v. Hennessy*, 853 F.2d 73 (2d Cir. 1988), Baez sued an Onondaga County prosecutor, and the county under *Monell*, after the prosecutor improperly indicted Baez based on an erroneous reading of a grand jury vote sheet.  We affirmed dismissal of both claims, concluding that the prosecutor was protected by absolute prosecutorial immunity and, relevant here, that the county was not a proper party for a *Monell* claim.  As to the latter conclusion, we reasoned that "[w]hen prosecuting a criminal matter, a district attorney in New York State, acting in a quasi-judicial capacity, represents the State and not the county."  *Id.* at 77.  And because the prosecutor was representing the state, the county could not be held legally responsible for injuries that the prosecutor had caused.  Although we have never questioned the conclusion in *Baez* that a

prosecutor is a state rather than a local representative "[w]hen prosecuting a criminal matter," *id.*, our subsequent cases have narrowed *Baez* in significant and relevant ways.

We began to cabin *Baez* in *Gentile v. County of Suffolk*, 926 F.2d 142 (2d Cir. 1991), where we affirmed a judgment concluding that the County of Suffolk, rather than the state, was the responsible party for purposes of *Monell* in relation to allegations that the county's district attorney's office had a policy of ignoring police misconduct. We rejected the argument that, under *Baez*, the district attorney's office's conduct was a function of state rather than county policies because, unlike in *Baez*, "the County's liability is based not upon a specific decision of the District Attorney to prosecute but upon the County's long history of negligent disciplinary practices regarding law enforcement personnel." *Id.* at 152 n.5.

We then reaffirmed and further developed the narrowing of *Baez* in *Walker v. City of New York*, 974 F.2d 293 (2d Cir. 1992), specifically noting that *Gentile* "confined *Baez* to challenges to specific decisions of the District Attorney to prosecute." *Id.* at 301 (internal quotation marks omitted). Moreover, *Walker* also made plain that when a *Monell* claim challenges policies of the City of New York's "constituent counties," the City is a proper defendant. *Id.*; *see also Ramos v. City of New York*, 285 A.D.2d 284, 303 (1st Dep't 2001). *Walker* reversed the dismissal of *Monell* claims against the City of New York

that alleged that the Kings County District Attorney's office failed to adequately train its prosecutors to turn over exculpatory evidence and not to suborn perjury. We concluded that in such an instance, notwithstanding *Baez*, "the district attorney is a municipal policymaker," because in making decisions other than whether to prosecute the "district attorney acts as the manager of the district attorney's office," which, we concluded, is a municipal function. 974 F.3d at 301. In *Ying Jing Gan v. City of New York*, 996 F.2d 522 (2d Cir. 1993), we reaffirmed *Walker* and clarified that a county prosecutor's actions are a function of state policies, rather than city policies, only where plaintiff's "claims center[] . . . on decisions whether or not, and on what charges, to prosecute," and not where those claims focus "on the administration of the district attorney's office." *Id.* at 536; *see also Pinaud v. County of Suffolk*, 52 F.3d 1139, 1153 n.14 (2d Cir. 1995).

Subsequent to these cases, the Supreme Court decided *McMillian v. Monroe County, Alabama*, 520 U.S. 781 (1997), a case that addressed *Monell* liability outside of the context of a prosecutor's office, but that clarified the scope of analysis for *Monell* claims generally. The Court held that Monroe County, Alabama was not the relevant policymaker for purposes of a *Monell* claim that asserted unconstitutional conduct of a Monroe County sheriff. How the Court arrived at that conclusion is significant: it examined Alabama law in detail and concluded that the state was the relevant final policymaker

because it had sufficient authority over the sheriff's specific functions at issue. *Id.* at 786. The Court relied heavily on the Alabama state constitution, for example, which evinced "'the framers' intent to ensure that sheriffs be considered executive officers of the state.'" *Id.* at 789 (quoting *Parker v. Amerson*, 519 So.2d 442, 444 (Ala. 1987)). The relevant lesson from *McMillian* is plain: because "the States have wide authority to set up their state and local governments as they wish," a search for the "final policymaking authority" under *Monell* "is dependent on an analysis of state law." *Id.* at 786, 795.

In *Myers v. County of Orange*, 157 F.3d 66 (2d Cir. 1998), in light of *McMillian*'s directive to delve into state law to ascertain a final policymaker for purposes of *Monell* liability, we revisited our cases discussed above that broadly applied *Monell* to prosecutors' offices. There, we addressed *Monell* claims brought against the New York County of Orange that alleged that the county's district attorney's office had an unconstitutional policy of refusing to entertain cross-complaints by complaining witnesses. *Id.* at 69. After reviewing a wealth of New York statutory and case law (which our earlier cases had not done), we reaffirmed our earlier conclusions that "[u]nder New York law, DAs and ADAs are generally presumed to be local county officers, not state officers," and reiterated once again that *Baez* was a "narrow exception . . . [for] when a prosecutor makes individual determinations about whether to prosecute." *Id.* at 76–77.

Because we have never doubted the rule stemming from the line of cases extending from *Gentile* and *Walker* to *Myers*, we have been consistent in holding that the actions of county prosecutors in New York are generally controlled by municipal policymakers for purposes of *Monell*, with a narrow exception emanating from *Baez* being the decision of whether, and on what charges, to prosecute. Thus, in this case, the rule from these cases requires the conclusion that the conduct Bellamy challenges is a result of municipal rather than state policymaking. The City does not dispute this reasoning based on our precedents, informed along the way by the Court's decision in *McMillian*. The City's sole contention is that our *Walker* line of cases was implicitly abrogated by the Supreme Court's 2009 decision in *Van de Kamp*, "requir[ing] a different boundary between prosecutorial and administrative functions than the one [we have] previously set forth." Br. of Appellees at 67. We disagree.

In *Van de Kamp*, plaintiff Goldstein obtained a vacatur of his state murder conviction by a grant of federal *habeas corpus* on the ground that the prosecution failed to disclose to the defense that they had offered a reduced sentence to a witness that provided critical inculpatory testimony. 555 U.S. at 339. As relevant here, Goldstein then filed a civil § 1983 claim against his prosecutors' supervisors (as individuals), arguing that they failed to train or supervise their prosecutors to prevent violations of the duty to disclose impeachment

material. *Id.* at 340. The defendants moved to dismiss on the basis of absolute prosecutorial immunity, an argument the district court rejected on the ground that prosecutors are entitled to absolute immunity only for "prosecutorial" functions, not "administrative" ones, and that the failure-to-train allegations fell in the latter category. *Id.* The Court of Appeals affirmed, 481 F.3d 1170 (9th Cir. 2007), but the Supreme Court reversed. It disagreed with the lower courts' conclusions that a prosecutor is not entitled to immunity simply because her challenged conduct can be labeled "administrative." Rather, the inquiry is whether the prosecutor's conduct (administrative or otherwise) was "directly connected with the conduct of a trial." 555 U.S. at 344. If so, the Court concluded, the conduct falls within the traditional immunity offered to prosecutors under long-standing notions of federal common law.

Although *Van de Kamp* said nothing about *Monell* or municipal liability, the City argues that *Van de Kamp* affects how *Monell* claims can proceed against prosecutors' offices specifically. Its argument is as follows. In the *Walker* line of cases, we concluded that inherently prosecutorial functions (*i.e.*, decisions whether to prosecute) are controlled by *state* policies for purposes of *Monell*, and other functions of the prosecutor are controlled by *municipal* policies. For example, in *Baez*, the act of indicting based on a misread grand jury verdict form was inherently prosecutorial and therefore a state function, but, in

*Walker*, the failure to train on *Brady* obligations related to the district attorney's management of the office, and we therefore concluded that was a municipal function. Consequently, the argument goes, our *Monell* cases have drawn separate circles around "prosecutorial" and "managerial" functions, with the former circle being state-controlled functions and the latter municipally-controlled ones. The argument then goes that although our cases have narrowed the "prosecutorial" circle such that it includes only the prosecutor's decision to bring charges, *Van de Kamp* expanded the circle of prosecutorial functions to include a failure to train on *Brady* obligations (which, the City argues, is akin to Bellamy's arguments here). Thus, the argument concludes, because Bellamy's claims pertain to conduct that now falls within the "prosecutorial" circle, and New York concludes "prosecutorial" conduct is a state function, the conduct supporting Bellamy's *Monell* claims must be a state rather than a municipal function. We are unpersuaded.

The key flaw in the City's argument is its unsupported assumption that the circle demarcating what is a "prosecutorial" function for purposes of prosecutorial immunity is necessarily the same as the circle New York has chosen to demarcate state versus local prosecutorial functions. But, the legal question of when immunity should attach is an entirely separate inquiry from which state entity is a final policymaker for *Monell*. This was the reasoning

adopted in *Goldstein v. City of Long Beach*, 715 F.3d 750 (9th Cir. 2013), the lower court decision that followed the Supreme Court's remand in *Van de Kamp*. Although the Court had rejected plaintiff's individual claims, the Ninth Circuit was left to evaluate plaintiff's remaining *Monell* claims. The defendants argued on remand, as the City does here, that "*Van de Kamp* determines the outcome" of the *Monell* claims. *Id.* at 760. The Ninth Circuit rejected the argument because "the inquiries of prosecutorial immunity and state or local policymaking . . . are separate." *Id*. We agree. In contrast to the immunity inquiry, *Monell* addresses not *whether* certain functions can open *individuals* to liability, but simply *which governmental entity* (the state or the municipality) is responsible for a given function. And as we have discussed, the Supreme Court has left no doubt that state law, not federal law, is responsible for demarcating that division of responsibility. The *McMillian* court was worried about imposing "a uniform, national characterization" of state actors, concerned that "such a blunderbuss approach would ignore a crucial axiom of our government: the States have wide authority to set up their state and local governments as they wish." 520 U.S. at 795. Consequently, the responsible entity for purposes of *Monell* liability must be ascertained by looking at how the relevant state elects to allocate responsibilities between itself and its subdivisions. *Id.*

The City's contention, if adopted, would turn *McMillian* on its head: it would require courts assessing *Monell* claims that challenge the conduct of prosecutors to consider the way in which the federal system chooses to immunize prosecutors in determining which functions are state functions and which are local ones. Stated differently, under the City's formulation, we would no longer be looking to the intricacies of state law to decide a *Monell* claim against a prosecutor's office, as we did in *Myers* (at the express direction of *McMillian*), but would instead look to *Van de Kamp*, a decision exclusively assessing *federal* common law and *federal* policy.[30]

Such a course would adversely affect state reliance interests as well: New York appellate courts have expressly affirmed our conclusions as to the content of New York law in *Walker* and *Myers*. *See Ramos*, 285 A.D.2d at 303 (concluding as "firmly grounded in New York law," the conclusion from *Gentile*, *Walker*, and *Myers* that "where prosecutors, pursuant to policy or custom, conceal exculpatory evidence and commit other wrongs in order to secure a conviction, liability rests with the county (or for New York City's constituent

---

[30] The focus on federal common law was center stage in *Van de Kamp*. *See* 555 U.S. at 340–41 (looking to Judge Learned Hand's policy statements from "[o]ver a half century ago"); *see also id.* (relying on *Imbler v. Pachtman*, 424 U.S. 409 (1976), the Court's "first opportunity to address the s 1983 liability of a state prosecuting officer," which then relied on federal cases dating back to the mid-19th-century, *id.* at 420–22 & n.18)).

counties, the City)"); *Johnson v. Kings Cnty. Dist. Atty's Office*, 308 A.D.2d 278, 295–96 (2d Dep't 2003) (same).

Thus we conclude, consistent with our precedent, that the City is the proper policymaking authority for purposes of Bellamy's *Monell* claims.

### b. The Alleged Constitutional Violations of the QCDA's Office

Bellamy proffers two underlying constitutional violations for which he claims the City is responsible: (i) the non-disclosure to the prosecution (and therefore to the defense) of the full benefits Sanchez was promised as part of her participation in the QCDA's WPP; and (ii) summation misconduct by ADA Guy. We conclude that Bellamy has presented sufficient evidence of both violations to withstand the motion for summary judgment.

### i. Benefits Promised to Sanchez

Bellamy contends that Sanchez was promised significantly more financial support from the QCDA than the $100 and undefined relocation benefits to which she testified at trial. *See* Trial Tr. 633–35. The district court, despite appearing to acknowledge that the record established that Sanchez was promised substantially more than that to which she testified, rejected the claim because the promised "benefits did not arise until *after* the plaintiff's trial, and did not affect the trial itself." 2017 WL 2189528, at \*40. This was error.

The record unmistakably raises a question of fact as to whether Sanchez was promised, prior to her testifying, substantially more than she ultimately disclosed during her testimony. Specifically, there is evidence in the record that Sanchez was promised, before trial, that the QCDA's office would relocate her, and, in doing so, would pay for her first month's rent, last month's rent, security deposit, and a broker fee, totaling $2,800. *See* Sanchez Dep. Tr. 79–97, 147–148; Dkt. No. 193-1 at 291 (Sanchez testimony at the initial § 440 proceeding). Daniel Cox, the WPP administrator who worked directly with Sanchez, testified at his deposition that his office generally referred to this as "Seed Money," and that he would tell program participants "early when you're starting to have conversations" that they would be receiving it. Cox Dep. Tr. 43. Cox clarified that he would tell participants about the seed money "at [the] first meeting," which, as to Sanchez, would have been on November 28, 1995, prior to her testifying. Cox Dep. Tr. 100–01; *but see* Mansfield Dep. Tr. 75–76 ("of course" we would make no specific promises during the orientation). In any event, Corporation counsel conceded at oral argument before us that a reasonable jury could conclude on this evidence that Cox promised Sanchez the seed money prior to her testifying. Oral Arg. Rec. at 36:04. And, ADA Guy testified at his deposition that he was never aware of the promised seed money,

either at the time of trial or even at the time of his deposition in this case. Guy Dep. Tr. 138–39.

As corporation counsel's concession makes plain, the City does not seriously dispute any of the above and argues only that Bellamy was not prejudiced by the lack of disclosure because the benefits that were disclosed at trial provided a sufficient basis for defense counsel to attack Sanchez's credibility. We disagree. The potential for witness bias is of course greater when the amount to be received is $2,800 as opposed to $100 (4 x $25/day), particularly for a witness of limited financial means like Sanchez, *see* App'x 1622. Further, the actual benefit promised was substantially larger than that to which Sanchez testified, which would have allowed for a heightened attack on Sanchez's truthfulness. Moreover, ADA Guy both conceded that the promise of $2,800 of seed money was *Brady* material and explained why the information was particularly probative in this case: "[The] dollar amount and total benefit amount is at odds with [Sanchez's trial] testimony. So it might affect her credibility and [if I were defense counsel] I might be able to make some use of that in asking the jury to disregard her or to at least challenge her credibility." Guy Dep. Tr. 138–41. Finally, the problem was exacerbated when ADA Guy, in his summation, noted the absence of evidence supporting the defense's contention that Sanchez had a motive to lie out of bias. *See* Trial Tr. 1139 ("Why would she come in and lie about the defendant?

Is there any evidence that she had any motivation to come in and lie about the defendant?"); Trial Tr. 1144 ("There is no evidence she is a liar.").

We therefore conclude that Bellamy raised a material issue of fact as to whether his *Brady* rights were violated by the QCDA's non-disclosure of the full scope of benefits promised to Sanchez prior to her testimony. And, in light of our conclusion that the City of New York may be held liable for this conduct, we vacate the district court's dismissal of this *Monell* claim.

### ii.  ADA Guy's Summation

Bellamy contends that ADA Guy made numerous improper remarks during his summation sufficient to render Bellamy's subsequent conviction a denial of due process. The district court disagreed, largely on its conclusion that ADA Guy's "comments were garden variety summation comments." 2017 WL 2189528, at *41. We disagree and conclude that the impact of the summation on the trial presents a jury question.

In *United States v. Certified Environmental Services, Inc.*, 753 F.3d 72 (2d Cir. 2014), we discussed the relevant standard:

> When reviewing claims of prosecutorial misconduct based on inappropriate remarks in the Government's . . . summation[], we will reverse if the misconduct caused substantial prejudice by so infecting the trial with unfairness as to make the resulting conviction a denial of due process. In assessing whether

prosecutorial misconduct caused 'substantial prejudice,' this Court has adopted a three-part test, which considers the severity of the misconduct, the measures adopted to cure the misconduct, and the certainty of conviction absent the misconduct.

*Id.* at 95 (internal quotation marks and citations omitted).

Bellamy contended at summary judgment that ADA Guy made fourteen improper summation remarks. App'x 1969–72. Bellamy contends these remarks were sufficiently improper to entitle him to relief under § 1983, even though his counsel did not object to them during trial (or afterwards). While we are not persuaded that the majority of the remarks identified by Bellamy were either improper or could have affected the trial, we believe that certain remarks were sufficiently problematic to require that they be assessed by a jury (despite the absence of a contemporaneous objection by trial counsel).

The most problematic is Bellamy's contention that ADA Guy told the jury near the end of his summation: "I know who committed the murder." Trial Tr. 1149. This statement was clearly improper and severely prejudicial if it was made. "It is unprofessional conduct for the prosecutor to express his or her personal belief or opinion as to the . . . evidence or guilt of the defendant." *United States v. Modica*, 663 F.2d 1173, 1178 (2d Cir. 1981) (*per curiam*) (quoting ABA Standards for Criminal Justice, Standard 3-5.8(b)); *see also U.S. v. Burse*, 531 F.2d 1151, 1154–55 (2d Cir. 1976) (a prosecutor may not give "the

impression that the government ha[s] within its possession evidence of [the defendant's] guilt which had not been given the jury"); *United States v. Rivera*, 22 F.3d 430, 437–38 (2d Cir. 1994) ("use of the personal pronoun 'I' . . . tends to [improperly] make an issue of [the prosecution's] own credibility" (internal quotation marks and alterations omitted)). We have concluded that the "policies underlying this proscription go to the heart of a fair trial." *Modica*, 663 F.2d at 1178. In short, it is the height of summation misconduct for a prosecutor to argue to the jury his personal opinion as to a defendant's guilt.

Defendants do not dispute that had the statement been made it would have been serious misconduct; rather, they point to ADA Guy's deposition testimony denying that he made the remark and contending that there was simply a transcription error in the trial record. Guy Dep. Tr. 154–55, 232 (stating that he said "[*you*] know who committed the murder"). But, on a motion for summary judgment, we must draw all inferences in favor of the non-movant, which requires us to accept the inference that the trial transcript accurately depicts what occurred at trial.

Regardless, that remark, if it occurred, does not stand alone. Also improper was ADA Guy's comment, again made near the end of his summation, that "you [Bellamy] are not going to get away with it, *not this time*." Trial Tr. 1150 (emphasis added). Viewed in Bellamy's

favor, this statement permitted the inference that Bellamy had committed other uncharged crimes at other times (murder, no less, the crime for which Bellamy was on trial) and that the government had evidence of those crimes to which the jury was not privy. *See United States v. Farmer*, 583 F.3d 131, 146 (2d Cir. 2009) (improper to make remarks "suggestive of a [defendant's] criminal disposition" where that remark has no otherwise "legitimate relationship to the crimes charged," especially where the remark hints at "a propensity to commit particularly heinous crimes," such as murder, "including the very offenses charged in the indictment" (internal quotation marks omitted)); *Burse*, 531 F.2d at 1155; *see also Manning v. Artuz*, 1996 WL 294359, at *3, *5 (E.D.N.Y. May 29, 1996) (prosecutor's summation statement that "the gun recovered by the police was the 'tool of [Petitioner's] trade' . . . overstepped the bounds of proper summation").

ADA Guy's summation contained other improper remarks. In arguing to the jury that the evidence showed that Carter identified Bellamy at the lineup, ADA Guy told the jury that they "don't have to take *my word*" on the subject, Trial Tr. 1137 (emphasis added), but, as discussed, a prosecutor may not inform the jury either way what his "word" is. *See Modica*, 663 F.2d at 1178–79. Also crossing the line was ADA Guy's rhetorical question to the jury, in a case where the government put in no evidence of motive: "Where is there proof

defendant had no motive to kill somebody?" Trial Tr. 1133. Of course, Bellamy was under no obligation to prove the absence of a motive and it is difficult to see how a defendant could possibly do so. At another point, ADA Guy remarked that Bellamy "is a liar," Trial Tr. 1148, a comment we have found deserving of admonishment, especially where, as here, "such characterization is applied to a [criminal] defendant . . . [where] the risk of prejudice is greater." *United States v. Leeds*, 457 F.2d 857, 860–61 (2d Cir. 1972).

The trial court took no "curative measures" to obviate the harms from these improper comments, *see United States v. Espinal*, 981 F.2d 664, 666–67 (2d Cir. 1992), but the reason for that is clear: Bellamy's defense counsel did not object to them nor subsequently seek a curative instruction.[31] A defense counsel's failure to object to an improper summation remark undercuts the probative value of the subsequent lack of a curative measure. *See United States v. Melendez*, 57 F.3d 238, 242 (2d Cir. 1995) (generally, "the failure to request specific instructions before the jury retires will limit the defense's ability to complain about the relative lack of curative measures for the first time on appeal"); *but see id.* (a "failure to request specific

---

[31] Defense counsel objected three times during ADA Guy's summation, but not with respect to any of the comments we identify above. *See* Trial Tr. 1127, 1129, 1143.

instructions may be overlooked where the prosecutor's misconduct is so prejudicial that no instruction could mitigate its effects").[32]

But, "[c]urative measures constitute only one part of the analysis." *Espinal*, 981 F.2d at 667. As identified above, the third component of our due process test requires, notwithstanding the lack of an objection from defense counsel, that we still ask how confident we are that the criminal defendant would have been convicted absent the summation misconduct. We must as a consequence take stock of the realities of the trial in which the summation misconduct due process violations are said to occur. For example, in *Farmer*, we found that the prosecutor's "flagrant abuse" through his summation remarks, not objected to by defense counsel, was insufficient to warrant reversal of one of the defendant's convictions because the defendant's guilt on that charge "was supported by such overwhelming evidence that conviction was a certainty," but the improper summation remarks did warrant reversal of defendant's conviction on a different charge for which the evidence "was far less conclusive." 583 F.3d at 147–48. As we concluded, "the determinative factor [was] the weight of the evidence." *Id.* at 147.

---

[32] We also note that Bellamy did not raise this summation misconduct issue on direct appeal or as part of his *habeas corpus* petition. But, there is no general exhaustion requirement under § 1983. *See Roach v. Morse*, 440 F.3d 53, 56 (2d Cir. 2006).

If the trial evidence here had clearly pointed to Bellamy's guilt, we would have no hesitation in rejecting his improper summation claim on this record. *See Espinal*, 981 F.2d at 666–67; *Farmer*, 583 F.3d at 147–48. The bar for concluding that unobjected to summation remarks amount to a due process violation is appropriately high. And we also acknowledge that as an appellate court we should be wary of "cherry-picking" improper yet isolated remarks from a cold record made during a lengthy summation, especially where defense counsel, who witnessed the statements live in court, offered no contemporaneous objection. But here, it is difficult to conclude other than that Bellamy's criminal trial existed at the cusp of reasonable doubt. Thus we conclude that a civil jury evaluating Bellamy's due process claim could reasonably find that ADA Guy's improper remarks pushed this case over the line.

Heading into summations, the QCDA's office had major misgivings about the quality of its case. *See generally People v. Bellamy*, 84 A.D.3d 1260, 1262 (2d Dep't 2011) (stating that there was "less than overwhelming evidence against [Bellamy]"); *see also* App'x 2088 (documenting the jury's prolonged and difficult deliberations). Discovery revealed that ADA Guy himself, after the close of evidence, thought the case had "sort of crumbled in [his] hand," and that he "needed something else." App'x 1715. ADA Guy met with other prosecutors, including his bureau chief, prior to giving his summation

because they all "sensed there was a problem going on." Guy Dep. Tr. 44–45, 192–93. And ADA Guy admitted during his deposition that although earlier he thought he had a strong case against Bellamy, by the time the evidence had closed "it was closer to being a weak case for the prosecution." Guy Dep. Tr. 46. In his deposition, ADA Guy acknowledged that "[t]here was also enough weakness that a jury could've said, no, we have a reasonable doubt." Guy Dep. Tr. 193. Indeed, "[t]he general consensus," ADA Guy acknowledged, "was that [he] needed a very strong summation in order to sort of salvage this case. . . . I thought I was in trouble." App'x 1718.

ADA Guy then delivered his "very strong summation," App'x 1718, but one that was supported by what our cases have consistently described as improper remarks that tend to sway the jury in constitutionally impermissible ways. The principal statements with which we take issue were given at the very end of ADA Guy's summation, which, in New York, follows the defense summation and is not subject to rebuttal. Thus, if the transcript is to be believed, the nearly final words the jury heard before entering deliberations were ADA Guy's statement that *he*, as the prosecutor, knew that Bellamy killed Abbott and that Bellamy was not going to get away with it, "*not this time*." Viewed in this context, and considering the other inappropriate comments we have identified, we conclude that Bellamy has raised a triable issue of fact as to whether ADA Guy's

summation "so infect[ed] [Bellamy's] trial with unfairness as to make [his] resulting conviction a denial of due process." *Certified Env. Servs., Inc.*, 753 F.3d at 95.

**CONCLUSION**

For the foregoing reasons, we VACATE in part and AFFIRM in part the judgment of the district court and REMAND for further proceedings consistent with this opinion.[33]

---

[33] Bellamy requests that we assign this case on remand to a different district judge. The request is denied.

JACOBS, *Circuit Judge,* dissenting in part:

I respectfully dissent insofar as the majority opinion vacates the grant of summary judgment on qualified immunity for Detectives Solomeno and Gillen, and vacates the grant of summary judgment dismissing the Monell claims against the City of New York. The facts of the matter are set forth meticulously in the majority opinion.

I

The majority opinion vacates the dismissal of two claims alleging fabrication of evidence.

Bellamy's "Murder" Statement. Bellamy, who had been identified as the murderer, was picked up ostensibly for drinking an alcoholic beverage in public. Det. Gillen testified that, when he made the arrest, Bellamy blurted out: "This must be a case of mistaken identity; someone probably accused me of murdering someone. Why would someone accuse me of something I didn't do?" App'x 290. Bellamy denies making the statement. On that self-serving denial alone, the majority opinion allows Bellamy's claim of manufactured evidence to withstand summary judgment. However, it cannot be that a viable claim of fabricated evidence can be premised on nothing more than a defendant's denial of a statement attributed to him by the police.

The district court's grant of summary judgment relied in part on Jeffreys v. City of New York, 426 F.3d 549, 551, 555 (2d Cir. 2005), which deemed insufficient an allegation of police misconduct that is unsubstantiated and inconsistent. The majority opinion distinguishes Jeffreys on the ground that Bellamy's explanation is "consistent and uncomplicated." Op. at 37. However, as in Jeffreys, Bellamy's claim is unsubstantiated and inconsistent.

There is less here by way of substantiation than there was in Jeffreys, in which the claim of excessive force was supported by affidavits from multiple family members, and by inferences drawn from medical records and police reports. Bellamy relies on his bald assertion. However, "[t]he non-moving party may not rely on mere conclusory allegations nor speculation, but instead must offer some hard evidence showing that its version of the events is not wholly fanciful." D'Amico v. City of New York, 132 F.3d 145, 149 (2d Cir. 1998).

1

Moreover, Bellamy's account of his interactions with the police is inconsistent in critical respects.  He first denied that Det. Gillen read him Miranda warnings, App'x 2392, before admitting that his statements followed a reading of his rights, App'x 1355-56; and he denied telling Det. Gillen that he went to the C-Town the morning of the murder, App'x 2396, before admitting that too, App'x 1357.  The majority opinion, which does not take account of these contradictions, deems Bellamy's denial "uncomplicated."  Op. at 37.  But it is neither complicated nor surprising that one would regret and deny an inculpatory remark.

The majority argues that there is evidence "tending to support an inference of fabrication" because the statement did not appear in the Form DD-5 prepared by Det. Gillen.  Op. at 37.  But a "lack of corroboration," Op. at 39, does not amount to evidence in support.  The majority opinion notes that no other police witness supported Det. Gillen's testimony.  Then again, Bellamy did not ask when he had the chance.

Det. Gillen's statement is corroborated by the notes he made in the police car while taking Bellamy to the police station, and on arrival there.  App'x 290, 2143.  Det. Gillen informed prosecutors about the "murder" statement the day it was made, Trial Tr. 539-40; and prosecutors disclosed it to Bellamy's counsel in two notices within two weeks, see App'x 1610.  And Det. Gillen testified consistently about the statement at the suppression hearing and at the trial, where he faced cross-examination on that issue.

Walker Interview Form DD-5.  The majority opinion entertains the claim that the Form DD-5 memorializing Veronica Walker's interview was fabricated.  However, Bellamy's claim fails as a matter of law because the DD-5 had no impact on the evidentiary record before the jury.  DuFort v. City of New York, 874 F.3d 338, 355 (2d Cir. 2017).

It had no impact on the evidentiary record because it did not come into evidence.  "The manufacture of false evidence in and of itself, . . . does not impair anyone's liberty, and therefore does not impair anyone's constitutional right."  Zharey v. Coffey, 221 F.3d 342, 358 (2d Cir. 2000) (internal quotation marks omitted).  "Mere attempts to withhold or falsify evidence cannot form the basis for a § 1983 claim for a violation of the right to due process when those attempts have no impact on the conduct of a criminal trial."  DuFort, 874 F.3d at 355.

2

As the majority opinion concedes, an attempt to distort the evidentiary record is irrelevant if the "jury is presented with the full universe of information, despite any earlier police misconduct"; but the majority opinion nevertheless conceives an exception for evidence that was somehow "materially relied upon" even if it was never in evidence.  Op. at 43.  The DD-5, which recounts Walker's identification of Bellamy, was not offered in evidence evidently because she refused to sign it.  The prosecution nevertheless asked Walker whether she identified Bellamy to the police.  But the prosecution's (ill-considered) question elicited a devastating reply: "No. . . . I said that it could have been him. It could have."  Trial Tr. 1005.  Any impression conveyed by asking the question was thus immediately undone "in a straightforward manner."  See DuFort, 874 F.3d at 355.  Furthermore, the court instructed the jury that counsel's questions were not evidence.  See, e.g., Trial Tr. 432, 827, 1140.  Therefore, "[a]ny attempt to distort the evidentiary record was fully mitigated" by Walker's testimony.  See DuFort, 874 F.3d at 355.

For ballast, the majority opinion relies on a police merit award that the prosecutor presented to the detectives, praising their initiative in preparing a detailed report of Walker's interview.  Op. at 45.  But the citation does not say that the substance of Walker's identification was conveyed to the jury--and it wouldn't matter if it did.  It goes without saying that the award was not offered in evidence.  The use of a police merit award in the majority opinion plows new ground that is better left unturned.


# II

The majority opinion vacates the district court's grant of summary judgment dismissing three claims alleging Brady violations.

Sanchez's Beer Statement.  Sanchez testified that she saw Bellamy follow the victim out of C-Town on the Saturday that the murder was committed.  A decade later, she recalled that Bellamy was prevented from buying beer.  Since beer can be sold all day on Saturdays but cannot be sold (until noon) on Sundays, Bellamy draws the inference that the witness was testifying about some day other than the day of the crime.  Bellamy's Brady claim is that the beer issue is thus exculpatory, that Sanchez conveyed that information to Det. Gillen, and that Gillen withheld that information from the prosecutor.

3

However, none of this matters for <u>Brady</u> purposes unless Sanchez told Det. Gillen that Bellamy was unable to buy beer, and told him so at a point in time when he could have conveyed it to the prosecution before trial. It was no until discovery in *this* case that Sanchez briefly acceded to a suggestion by Bellamy's counsel that she told the detective "at some point." App'x 1499. That assent was elicited after experienced counsel used all his efforts to outwit a witness who bags groceries. And even so, he failed: the vague and unhelpful concession came after and was followed by repeated denials.[1] App'x 1495-1500. Bellamy offers no evidence that the Det. Gillen had evidence in 1994 or 1995 that Sanchez saw Bellamy follow the victim on a Sunday.

The majority posits that the trial outcome would have been different "[h]ad defense counsel been able to impeach Sanchez with" the inconsistency that (i) she saw Bellamy in C-Town on a day on which he could not buy beer, and (ii) that day was a Saturday. Op. at 52. But to the extent Sanchez was confused on this point, her confusion was evident at trial, and available for exploitation by the defense. She testified that she noticed Bellamy because "[h]e was buying beer on a Sunday--on a Saturday that day." Trial Tr. 642. Moreover, the prosecution told the jury that Sanchez gave contradictory testimony, Trial Tr. 1138. If (as the majority opinion has it) Sanchez's imperfect memory "would have been of great value to the defense," Op. at 52, it is odd that defense counsel did not ask her a single question about the blue laws in Queens.

In any event, the issue is not difficult. Sanchez saw Bellamy buying beer in C-Town almost everyday. Trial Tr. 642, 676. No one should be surprised if a convenience store prevents somebody from buying more beer--on any day of the week. And Bellamy was not abstemious: he was drinking a 40-ounce container of beer when he was arrested two weeks later.

<u>Sanchez's Identification of Lee.</u> Following Sanchez's identification of Bellamy, the police showed her a picture of Terrill Lee, whom she said was accompanying Bellamy on the day of the murder. Bellamy conceded that he was

---

[1] "Q. And you told [Det. Gillen] [Bellamy] was trying to buy beer on a day he couldn't buy beer? A. I can't remember that part. . . . Q. So you may not remember exactly when but at some point you told them about [sic] he was trying to buy beer and he couldn't buy beer? A. Correct, yes. . . . Q. Which day, you don't remember which day? A. I can't remember if I said that. I can't remember if I said that what day was the 22nd or--I can't." Appx 1495-1500.

4

with Lee, but only later in the day. But Lee's wife told the police that Lee was with her that day and not with Bellamy at all. The detectives inferred that if Lee was not there, Sanchez must have seen the two of them together on some other day, so the police did not investigate the matter further.

Bellamy's <u>Brady</u> claim is that the police failed to tell the prosecution that they dropped Lee from their investigation. The majority opinion characterizes this <u>Brady</u> claim as "close," which is generous. As the district court explained, it is hard to see how this evidence would have helped Bellamy: a decision by the police not to investigate whether Lee was there does not constitute evidence that he wasn't, let alone that Bellamy was elsewhere as well. Anyway, Lee's presence was not an issue at the trial. By then, Bellamy had changed his alibi: he was with his father.

More fundamentally, there was no suppression of the evidence bearing upon this claim, and therefore there could not have been a <u>Brady</u> violation. "Evidence is not 'suppressed' [for <u>Brady</u> purposes] if the defendant either knew or should have known of the essential facts permitting him to take advantage of any exculpatory evidence." <u>United States v. LeRoy</u>, 687 F.2d 610, 618 (2d Cir. 1982) (internal citations omitted). "The government is not required to make a witness' statement known to a defendant who is on notice of the essential facts which would enable him to call the witness and thus take advantage of any exculpatory testimony that [s]he might furnish." <u>United States v. Stewart</u>, 513 F.2d 957, 960 (2d Cir. 1975).

The defense was on notice of all the facts. Bellamy knew, well in advance of trial, that Sanchez was a witness to the events that took place in C-Town the morning of the murder. He knew that she claimed to have seen him with another male. And he knew (according to his own statements) that he had been with Lee that day. Accordingly, Bellamy was "on notice of the essential facts" that enabled him to ask Sanchez whether she had seen him with Lee.

The majority opinion suggests that the exculpatory value of the decision not to investigate about Lee would have been to impeach Sanchez. But if the identification was to be used only to show Sanchez was unreliable, this method would have been complicated and unconvincing--and it would only have emphasized that Bellamy switched alibis.

5

The Walker Form DD-5. Veronica Walker refused to sign the DD-5 prepared after her interview, and made statements that Bellamy was not the person she saw at the time of the crime. Bellamy alleges that the police failed to tell that to the prosecution. While this information (if true) should have been conveyed, this claim has been forfeited. See Patterson v. Balsamico, 440 F.3d 104, 112 (2d Cir. 2006) (deeming a forfeited civil claim "abandoned" and declining to consider it). It was pleaded as a Brady claim in the complaint; the defendants moved to dismiss as immaterial all Brady claims premised on Walker's testimony, App'x 737; Bellamy's response did not mention this claim; the district court did not mention it either; and there was no motion to reconsider. Bellamy cannot now press the point on appeal.

## III

The majority opinion vacates the district court's grant of summary judgment dismissing two Monell claims against the City of New York.

Benefits Promised to Sanchez. The defense argued to the jury that Sanchez's testimony should be discounted as induced by bribes, because Sanchez was receiving $25 a week from the government, along with certain other benefits. The majority opinion points out, however, that the defense was not told the total dollar figure. Op. at 74. This is presented as a Monell claim because it was or is the practice not to tell the prosecutor the full scope of such assistance. This claim fails for several reasons.

The prosecution disclosed all the evidence required; and Bellamy was on notice of facts permitting him to elicit any additional evidence from the witness. See LeRoy, 687 F.2d at 618. The prosecution disclosed to the defense that that she had been placed in witness protection; that she had been given $25 per day ever since; that she would continue to receive subsidies (for an unspecified time); that she had been temporarily relocated by the government; and that the government was proceeding with permanent relocation. And since it was further disclosed that she was unmarried, unemployed, and supporting herself (and her little twins) on public assistance, the inference was clear that the government was paying for all this. The majority cites no case suggesting that additional disclosures were required.

6

Moreover, the jury knew that Sanchez was receiving benefits, and that she was being permanently relocated. On that basis, the cash total ($2,800) was not material to the defense. See United States v. Brown, 582 F.2d 197, 200-01 (2d Cir. 1978) (no prejudice where non-disclosure had no effect on the defense's theory of the case).

In any event, it would have done the defense no good to bring out the full amount and thereby risk that the prosecution would refute an imputation of bribery by explaining that Sanchez was being supported because she was in the witness protection program. Any juror would infer from that that Bellamy was dangerous. The evidence that Bellamy claims would be exculpatory would therefore have operated as a boomerang. If defense counsel had used the information the Bellamy claims he needed, Bellamy might have ended up with a valid claim of ineffective counsel.

The State's Summation. I agree with the majority opinion that (contrary to the district court's ruling) the City can be held responsible for the failure by a district attorney to train staff to avoid improprieties in summation. However, since discovery was stayed as to the existence and sufficiency of the City's training, the only question now is whether the improper summation resulted in "substantial prejudice." United States v. Certified Envtl. Servs., Inc., 753 F.3d 72, 95 (2d Cir. 2014). That turns on: (i) the severity of the misconduct; (ii) the value of any curative instruction; and (iii) the weight of the evidence. Id. I will take them one by one.

(i) Bellamy identifies remarks that are, as the majority opinion recognizes, troubling. Op. at 76-78. But (ii) as the majority opinion observes, "Bellamy's defense counsel did not object to them nor subsequently seek a curative instruction." Op. at 79. Nor did Bellamy raise this summation misconduct on direct appeal or as part of his habeas corpus petition. It is therefore implausible that the absence of a curative instruction was consequential. Op. at 80; see United States v. Melendez, 57 F.3d 238, 242 (2d Cir. 1995). So the majority opinion concludes, and I agree, that the "the determinative factor" is the weight of the evidence. Op. at 81.

(iii) Bellamy undertakes "a heavy burden" of establishing misconduct "so severe and significant as to result in the denial" of due process. United States v. Locascio, 6 F.3d 924, 945 (2d Cir. 1993). "[W]here the jury's verdict finds substantial support in the evidence, counsel's improper statements will

7

frequently be <u>de minimis</u> in the context of the entire trial."  <u>Marcic v. Reinauer</u>
<u>Transp. Cos.,</u> 397 F.3d 120, 124 (2d Cir. 2005).

The majority opinion asserts that Bellamy's trial "existed at the cusp of reasonable doubt."  Op. at 81.  However, the evidence easily supported conviction.  Bellamy admitted that he had known the victim for years and had been in the C-Town the morning of the murder.  Sanchez (who recognized Bellamy as a regular customer) testified that she saw him follow the victim out of the C-Town the morning of the murder.  That testimony placed Bellamy and the victim together at the very time and place that another witness (Carter) watched from a few feet away as Bellamy stabbed the victim.  And Sanchez testified that Bellamy later returned to the C-Town to threaten her into silence.

Bellamy's conviction was not attributable to improper remarks on summation.